**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 31, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

FRANK J. NIELANDER,

Plaintiff-Appellant,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF REPUBLIC, KANSAS,
MARK NORDELL, JOSHUA PEREZ,
BETH REED, and FRANK
SPURNEY, in his individual capacity
and in his official capacity as the
REPUBLIC COUNTY ATTORNEY,

Defendants-Appellees.

No. 08-3092

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:06–CV–2013–JAR)**

---

Teresa L. Watson, Fisher, Patterson, Sayler & Smith, LLP (David R. Cooper,
Fisher, Patterson, Sayler & Smith, LLP, with her on the briefs), for Plaintiff-
Appellant.

Tara S. Eberline, Foulston Siefkin, LLP (James D. Oliver and Wendell F. Cowan,
Foulston Siefkin, LLP, with her on the briefs), for Defendants-Appellees.

---

Before **BRISCOE**, **BRORBY** and **McCONNELL**, Circuit Judges,

**McCONNELL**, Circuit Judge.

This case calls on us to consider various claims arising out of the prosecution of Frank Nielander for allegedly threatening local government employees in an angered response to the way his local road was being maintained. The district court dismissed all of Mr. Nielander's claims. We affirm.

## I. Background

### A.    Preliminaries

Mr. Nielander lives on County Road 180 in Republic County, Kansas, the road leading to the county landfill. Mr. Nielander experienced many problems on the road due to debris from traffic hauling trash to the landfill. He attended meetings of the Board of Commissioners to complain about the debris. Defendants Beth Reed, the Solid Waste Secretary and secretary/receptionist for Republic County, and Sheriff's Deputy Josh Perez were aware prior to July 9, 2004 that Mr. Nielander had made such complaints.

On July 9, 2004, Mr. Nielander and his daughter entered the Republic County Courthouse Sanitary Landfill Office to pay the landfill fee. Mr. Nielander first checked the Commissioners' room, which was empty. Then Ms. Reed approached him, saying, "I'll be right with you." Mr. Nielander started writing a check while asking Ms. Reed if he could talk to her about a problem he had. She said he could. After signing the check he told her, "this is really bad what's

going on here. I'm ruining tires, I'm ruining my cars." He explained the situation by way of analogy, saying that it would be like demanding ten dollars from her every time he poked her tire with an ice pick. Ms. Reed replied that she knew he had a real problem out there.

The two kept talking about the situation, and Mr. Nielander's daughter told Ms. Reed that the road was also dangerous because of how it was graded. Mr. Nielander interrupted her and said, "we're not here to discuss this road." Defendant Mark Nordell, another county employee, then walked in and asked what the problem was with the road. Mr. Nielander's daughter then explained the situation. When she finished, Mr. Nordell stepped in front of Mr. Nielander and told him to air his complaints at a Commissioners' meeting.

There is some discrepancy over what precisely was said after this point.

## B. Mr. Nielander's Account of the July 9 Incident

Mr. Nielander claims that he said he was not going to another Commissioners' meeting because past meetings had proved fruitless. He assured Mr. Nordell that he was not mad at Ms. Reed, but at the Commissioners. He handed Ms. Reed the check and asked her if she "would be so kind as to let Commissioner Wilber know that [he] wasn't paying this again until they either fixed the road or [he] consult[ed] with an attorney about it." Mr. Nordell "started in on [him] again" about how he needed to go to Commissioners' meetings. Mr. Nielander responded, "[Y]ou know what, it's fallen on deaf ears. Every time I've

gone in there they have no solution, they don't even look for a solution to the problem. So . . . I'm not going in there anymore." He then called Commissioner Nelson a "complete idiot," said Commissioner Linda Hall was "about as useless as a coat rack. Just set her in the corner somewhere and that's all she'll do. She won't do nothing for you," and said Highway Administrator Alvin Perez was unqualified.

After Mr. Nordell reiterated that he should attend Commissioners' meetings, Mr. Nielander stated that he would "never go to another one because I'd be too afraid that I'd want to bring along a gun." Mr. Nordell responded: "[W]hoa, whoa whoa. Better . . . watch what you say, you get in big trouble for that." Mr. Nielander told Mr. Nordell he was not making any threats. Mr. Nordell said that he needed to pay the landfill fees or "they" would come and collect it from him. Mr. Nielander replied, "then they'll have another Ruby Ridge," said "have a nice day," and walked out of the courthouse with his daughter.

## C.    Mr. Nordell's Version of the July 9 Incident

Mr. Nordell, in a statement to police, claimed that Mr. Nielander said he had tried to speak with the Board of Commissioners twice in the past and nothing happened. Mr. Nielander insulted various public officials. He called the Commissioners "stupid idiots." He said one of the Commissioners was a "Son of a Bitch," and so was Alvin Perez. Mr. Nordell also reported that Mr. Nielander

-4-

stated the next time he came into the Board of Commissioners he would bring a gun. After Mr. Nielander handed the check to Ms. Reed, he said it was the last time he was paying the tax and that "'they' can come out and try and collect it and we will have another Ruby Ridge."

In his subsequent deposition, Mr. Nordell reported substantially the same facts. He stated that Mr. Nielander was "almost yelling" at Ms. Reed, that he called the Commissioners "a bunch of dumb idiots or that type of thing," that he called one of the Commissioners a "[s]on of a bitch," that he had said "if he came back in that he would have a gun," that he told Ms. Reed he was not threatening her, and that he said this was "the last time he's paying this bill or tax, and then if they can come try to collect we'll have another Ruby Ridge." Mr. Nordell denied that Mr. Nielander ever said, "I'm never coming to another commission meeting for fear I'd want to bring a gun," and did not recall him referring to one particular Commissioner as a "coatrack." Mr. Nordell also testified in his deposition that he understood "to some degree what Ruby Ridge was," but he could not recall what he felt at the time the reference was made.

## D. Ms. Reed's Account of the Incident

Ms. Reed explained in a statement to police that Mr. Nielander became agitated when he was told to visit with the Commissioners to voice his complaints. He said "he had been in to see the Commissioners before and the next time he came in, it would be with a gun and that he could promise there

would be another Ruby Ridge." According to Ms. Reed's statement, Mr. Nielander called the Commissioners "dumb idiots," called one of the Commissioners "a joke," and called Alvin Perez a "dumb s.o.b.". When Mr. Nordell told Mr. Nielander not to talk like that, "Mr. Nielander said that he was not yelling at the Secretary and that he thought that it was understood that he was mad at the Commissioners." The last sentence in the statement reads: "I did feel somewhat threatened and was very glad that Mr. Nordell and Mr. Raney were present."

Her testimony in her subsequent deposition was also substantially the same as the statement she submitted to police. She testified that she was "surprised" by her interaction with Mr. Nielander on July 9 because "this is not the kind of conversation you normally have in a workplace." She did not recall Mr. Nielander comparing one of the Commissioners to a coatrack, but conceded that Mr. Nielander said to her "I'm not yelling at you, you understand that, right?"

## E.     Aftermath

After Mr. Nielander left Ms. Reed's office, Mr. Nordell called the sheriff because he "felt obligated" to report Mr. Nielander's statement about bringing a gun and the reference to Ruby Ridge as a "possible threat." He thought someone "needed to come down and listen to what just happened." Ms. Reed was unaware that Mr. Nordell was going to contact law enforcement; she did not initiate any such contact herself.

Later that afternoon Republic County Sheriff's Deputy Joshua Perez, who happens to be the son of Highway Administrator Alvin Perez, came to Mr. Nordell's office to interview him about the incident. Mr. Nordell reported that Mr. Nielander was mad about having to pay his solid waste tax, and claimed Mr. Nielander had said "that the next time he come to the, came back he would bring a gun." Deputy Perez requested that Mr. Nordell submit a written statement to him, and Mr. Nordell did so the next day.

Then Deputy Perez entered Ms. Reed's office to interview her about the incident. According to Deputy Perez, Ms. Reed told him that "Frank Nielander came in to pay his solid waste tax . . . He got—he was upset, made the comment that he would—next time he came he would bring a gun and something to do with Ruby Ridge." Deputy Perez then told her, in effect, that "this kind of talk is not acceptable in today's workplace." He asked her to write down what happened, including how she felt while Mr. Nielander made the statements, and that he would "take it from there." Ms. Reed submitted a statement shortly thereafter.

Deputy Perez then prepared a "Probable Cause Determination and Order to Appear" and a "Standard Offense and Arrest Report." He attached Ms. Reed's and Mr. Nordell's statements to the Probable Cause Determination. The Determination included Ms. Reed's and Mr. Nordell's recitations of Mr. Nielander's statements regarding a gun and Ruby Ridge. The Determination contained no mention of the insults Mr. Nielander made about Alvin Perez or any

of the Commissioners. Deputy Perez later testified that he did not include the insults in the Determination because "it's freedom of speech. He has his rights to say what he wants to say about the county Commissioners and the county engineer. That's his freedom. He ain't breaking the law by saying that."

Deputy Perez notified County Attorney Frank Spurney of the incident the week of July 12, 2004, and on July 14 gave him the documents he had prepared. At the Board of Commissioners meeting on July 19, 2004, Mr. Spurney notified the Board that he would be filing charges against Mr. Nielander for threatening the Board. Mr. Spurney signed and caused to be filed a two-count Complaint/Information charging Mr. Nielander with felony criminal threat, as well as disorderly conduct, a misdemeanor. The Complaint/Information did not include specific facts surrounding the incident, but did recite the elements of the crime. Mr. Spurney verified the Complaint/Information.

Mr. Nielander was served with a summons. One month later, County Attorney Spurney filed an Amended Complaint/Information, which added Ms. Reed as an individual whom Mr. Nielander intended to threaten and listed Ms. Reed and Mr. Nordell as witnesses. On September 8, 2004, a preliminary hearing was held, at which both Ms. Reed and Mr. Nordell testified. At this hearing, Ms. Reed testified that she did not feel threatened at the moment that Mr. Nielander spoke, but that she would feel threatened if he came back with a gun because of where she sat in the office. Aplt. App'x 559–60. She acknowledged that Mr.

Nielander's statements were not directed towards her. *Id.* The Magistrate Judge found that there was probable cause to believe Mr. Nielander had made a criminal threat.

On October 11, 2004, while the charges were pending, Mr. Nielander traveled to Texas for a job interview. Immediately following the interview, he was offered a position as Gas Controller. Mr. Nielander accepted and was told to start in three or four days. Mr. Nielander returned to Kansas, where he learned that his criminal trial had been rescheduled for January 2005. He called his new Texas employer to explain that he could not start work as soon as he had thought. In his brief, Mr. Nielander explains that he knew he might be convicted and sentenced to jail in Kansas, or sentenced to a period of probation, the terms of which would require him to remain within Kansas. The Texas employer told Mr. Nielander to call when he knew when he would be able to report to work. Mr. Nielander did so in early 2005, but by then the employer no longer desired to employ him.

On January 13, 2005, the District Court of Republic County entered an order finding that the preliminary hearing testimony did not establish probable cause for the criminal threat charge and dismissing the charge. Order on Defendant's Motion to Dismiss 1. County Attorney Spurney then voluntarily dismissed the disorderly conduct charge.

F.      **Proceedings in District Court**

Mr. Nielander filed a § 1983 suit in federal district court against Mr. Nordell, Ms. Reed, Deputy Perez, Attorney Spurney, and Republic County, alleging malicious prosecution, First Amendment retaliation, and conspiracy. He claimed he was forced to hire an attorney, experienced significant anguish, and lost a job offered to him because of the prosecution. On a motion to dismiss, the district court granted Mr. Spurney absolute prosecutorial immunity.

After discovery, the remaining defendants filed a motion for summary judgment on all claims. They claimed Ms. Reed and Mr. Nordell were entitled to absolute immunity against the federal claims of malicious prosecution, First Amendment retaliation, and conspiracy to commit both because they were not complaining witnesses and Mr. Nielander provided no evidence that their accounts of his statements were intentionally false. They also claimed Mr. Nielander's malicious prosecution claim failed because Mr. Nielander was not seized, because the individual defendants should be entitled to qualified immunity, and because Mr. Nielander had not provided evidence to create issues of fact about who instituted the proceedings, whether there was probable cause, or whether they acted with malicious intent. They argued that the retaliatory prosecution and conspiracy claims should be dismissed because Ms. Reed, Mr. Nordell, and Deputy Perez were entitled to qualified immunity, and because Mr. Nielander had failed to provide evidence that his protected speech motivated the charges. Finally, defendants argued they were all entitled to immunity from the

state law claims, and that all claims against Republic County Board of County Commissioners failed "because no individual committed a constitutional violation and there is no evidence that an unconstitutional policy or custom resulted in Plaintiff's claims." Def. Mot. Summ. J. 2.

The court heard oral arguments, then granted all of the defendants summary judgment on the federal claims, holding that the malicious prosecution claim failed because Mr. Nielander had not been seized and the First Amendment retaliation claim failed because Mr. Nielander's speech was a threat, and therefore not protected by the First Amendment. The court granted immunity from state law claims to Ms. Reed and Deputy Perez. The County again argued that it could not be liable for the actions of County Attorney Spurney unless Mr. Nielander could show that "the execution of the government's policy or custom inflicts injury," and that it is not the policy of the county to maliciously prosecute individuals. At this point in the summary judgment hearing, however, no federal claims were at issue. This was brought to the court's attention by opposing counsel, and the court agreed that only state claims were left so the "policy or custom" rule did not apply. The court later said it was "taking under advisement the . . . municipal liability [issue] with respect to the county," but this was only with regard to the remaining state law claims. In a subsequent order, the district court declined to exercise jurisdiction over the remaining state law claims. Mr. Nielander timely appealed.

-11-

## II. Discussion

The parties raise a number of issues. We will begin with the district court's ruling on County Attorney Spurney's motion to dismiss on the basis of prosecutorial immunity. We then address the merits of the district court's grant of summary judgment in favor of all defendants on the two federal claims, for malicious prosecution and first amendment retaliation. Finally, we address the district court's disposition of the state law claims.

### A. Immunity for the County Attorney

Prior to discovery, the district court accorded absolute prosecutorial immunity to County Attorney Frank Spurney based on the facts alleged in Mr. Nielander's complaint. Dist. Ct. Or. 5. On appeal of this order of dismissal, we, too, "must accept all the well-pleaded allegations of the complaint as true." *David v. City & County of Denver* 101 F.3d 1344, 1352 (10th Cir. 1996).

Prosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence-gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court. *Imbler v. Pachtman*, 424 U.S. 409, 425–28 (1976). A prosecutor is not entitled to such immunity, however, when he is acting as a witness rather than an advocate. Where a prosecutor personally vouches for the truth of the facts set forth in a certification, he is considered a witness and not entitled to immunity. *See Kalina v. Fletcher*,

522 U.S. 118, 125–29 (1997). Mr. Nielander argues that Mr. Spurney was acting as a witness in this case, and therefore is not entitled to immunity. We disagree.

Mr. Nielander alleged that Mr. Spurney signed and verified a Complaint/Information in which he "aver[r]ed that Nielander had communicated 'a threat to commit violence against: Republic County Commissioners and Republic County Highway Administrator with intent to terrorize another, to–wit: Beth Reed.'" Aplt. App'x 21. He did not allege, however, that Mr. Spurney personally vouched for the truth of any specific facts in the Complaint/Information. In fact, no such facts were averred in the document. In *Kalina*, the Supreme Court held that a prosecutor is entitled to immunity for filing an information and a motion for an arrest warrant, but not for personally vouching for the truth of the facts in the certifications. *Kalina*, 522 U.S. at 121. Because County Attorney Spurney did not personally vouch for or even list any of the facts in the Complaint/Information, he is entitled to absolute immunity on all claims.

Though not raised by the defendants in this case, Eleventh Amendment immunity would shield Attorney Spurney from liability in his official capacity. In Kansas, county attorneys act on behalf of the state, not their respective counties. *See Schroeder v. Kochanowski*, 311 F. Supp.2d 1241, 1254 (D. Kan. 2004). Thus, "[a]ny actions by the county attorney are . . . attributable to the state[,] mean[ing] that the county attorney's acts in prosecuting crimes are

-13-

cloaked with Eleventh Amendment immunity." *Id.*

**B.    Federal Claims Against Deputy Perez, Ms. Reed, Mr. Nordell, and the County**

**1.    Malicious Prosecution**

To establish a malicious prosecution claim under § 1983, a plaintiff must prove that the defendant initiated or continued a proceeding against him without probable cause. *Becker v. Kroll*, 494 F.3d 904, 913–14 (10th Cir. 2007). The Supreme Court has held that because malicious prosecution claims are Fourth Amendment claims, a plaintiff must prove that he was also seized in order to prevail. *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality). The district court granted summary judgment for all defendants on Mr. Nielander's federal malicious prosecution claim because he was not seized within the meaning of the Fourth Amendment. *Nielander v. Bd. of County Comm'rs*, No. 06-2013-JAR, 2008 U.S. Dist. LEXIS 24777, at *7 (D. Kan. 2008).

Mr. Nielander argues that he did not actually have to be arrested to establish a Fourth Amendment violation, but that he was "seized" because the criminal summons had a legal effect on his freedom of movement; in particular, it precluded him from starting his out-of-state job. Whatever may be the logic of this argument, *see Albright*, 510 U.S. at 277-78 (Ginsburg, J., concurring), our precedent dictates otherwise. *See Becker*, 494 F.3d 904, 915 (declining "to expand Fourth Amendment liability in cases where the plaintiff has not been

-14-

arrested or incarcerated"). Thus, the district court properly concluded that Mr. Nielander failed to state a Fourth Amendment violation on which to base his malicious prosecution claim.

**2.      First Amendment Retaliation**

To establish a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). The district court granted summary judgment for all of the defendants on Mr. Nielander's First Amendment retaliation claim. The court held that although Mr. Nielander was engaged in constitutionally protected activity, some of the language he used was not constitutionally protected because it conveyed a threat. Tr. of Sum. Judg. Hr. 14. It was this threat that motivated the report on the incident and the filing of charges. *Id.* at 17. Thus, the court concluded that Mr. Nielander failed to establish a viable First Amendment retaliation claim. *Id.*

Mr. Nielander spends much of his brief arguing that the insults he made toward the Commissioners and Alvin Perez at least partially motivated the government's actions. Insults are not threats. Pointing to Deputy Perez's Probable Cause Determination, however, the defendants insist that the record

-15-

shows that only the statements about Ruby Ridge and "the words that he said about bringing the gun" motivated the prosecution. Aplt. App'x 513. A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact. *Vukadinovich v. Bd. of Sch. Tr. of N. Newton Sch. Corp.*, 278 F.3d 693, 700 (7th Cir. 2002). It is undisputed that Deputy Perez excluded any mention of the insults from the Probable Cause Determination, precisely because he understood those statements were constitutionally protected. Thus, the district court properly determined that the statements about Ruby Ridge and the gun motivated the government's actions—not the insults. Tr. of Sum. Judg. Hr. 16. This means that only the first element—whether the statements were constitutionally protected—is genuinely at issue.

Mr. Nielander claims that the two statements (about the gun and about Ruby Ridge) were not threats and, as such, were constitutionally protected. This court has held that "whether a defendant's statement is a 'true threat' or a 'political speech' is generally a jury question." *United States v. Leaverton*, 835 F.2d 254, 257 (10th Cir. 1987). According to Mr. Nielander, there is a genuine issue of material fact as to whether the two statements were threats, thus making summary judgment on this ground inappropriate.

Though we are inclined to agree that a reasonable jury could debate

-16-

whether either statement constituted a true threat, we recognize that we may affirm on any grounds that are sufficiently supported by the record to allow for a conclusion as a matter of law. *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994). Even if Mr. Nielander has a viable First Amendment retaliation claim, Mr. Nordell, Ms. Reed, and Deputy Perez argue that they are entitled to qualified immunity. Because we agree, we affirm the grant of summary judgment.

### a. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from individual liability in federal claims unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Shero v. City of Grove*, 510 F.3d 1196, 1204 (10th Cir. 2007); *see also Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815 (2009). Applying this standard, we first conclude that Mr. Nordell and Ms. Reed did not violate Mr. Nielander's rights. Individuals merely providing the police with their account of events commit no constitutional violation at all, as they are not bringing charges. *See Carey v. Continental Airlines, Inc.*, 823 F.2d 1402, 1404 (10th Cir. 1987) (holding that one who made a complaint to police about plaintiff which led to an unlawful arrest after police investigation was not liable under § 1983); *Benavidez v. Gunnell*, 722 F.2d 615 (10th Cir. 1983) (holding that "the mere furnishing of information to police officers who take action thereon" does

-17-

not result in liability under § 1983).  There is no evidence in the record that Ms. Reed or Mr. Nordell intentionally lied to law enforcement or sought to procure Mr. Nielander's prosecution.[1]  Unlike Deputy Perez, who sought out information upon which to convict, reported the events to the prosecutor, and prepared a probable cause determination, an order to appear, and a standard offense and arrest report, Mr. Nordell simply reported the incident to the police, and Ms. Reed merely responded to a subsequent request for information regarding the incident. They did not actively initiate any proceedings against Mr. Nielander.  For this reason, Mr. Nordell and Ms. Reed are entitled to qualified immunity on this claim.

That leaves Deputy Perez.  Although we think a jury may be able to find that Mr. Nielander's statements, at least taken in the light most favorable to him, were not threats and his First Amendment rights were violated by Deputy Perez, we need not decide the issue.  We are permitted to address whether the law is clearly established before addressing whether a constitutional violation has occurred.  *Pearson*, — U.S. at —, 129 S.Ct. at 818.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

---

[1] In his appellate brief, the plaintiff asserts that Ms. Reed and Mr. Nordell "knew full well that Nielander hadn't threatened them and was not coming back to see the Commissioners."  Aplt. Br. 30; see also Aplt. Br. 14, 47, 56.  But mere discrepancies in various parties' recollections of the conversation fall short of evidence of intentional falsehood or intention to induce retaliatory prosecution.

-18-

confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In other words, we must determine whether a reasonable officer could conclude that Mr. Nielander's statements were true threats before determining if there was a constitutional violation. If so, Deputy Perez is entitled to qualified immunity.

Determining whether the law is clearly established usually requires a Supreme Court or Tenth Circuit decision on point. *See Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009). We have recognized, however, that "[t]he plaintiff is not required to show . . . that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (citations omitted). Still, we do not think precedent is sufficiently clear to hold that no reasonable officer could have thought Mr. Nielander's speech was unprotected.

Much of Mr. Nielander's brief focuses on disputes of historical fact that would normally render summary judgment inappropriate. At the summary judgment hearing, Mr. Nielander's counsel confirmed that Mr. Nielander had said, in substance, that he was afraid to attend another Commissioners' meeting for fear that he would bring a gun along ("statement one"), and if the government came to his house to collect his taxes, they would have another Ruby Ridge ("statement two"). Tr. of Sum. Judg. Hr. 10. Mr. Nordell and Ms. Reed both reported that Mr. Nielander said the next time Mr. Nielander came to a

Commissioners' meeting he would bring a gun, and if officers tried to collect his taxes there would be another Ruby Ridge. Thus, there appears to be a genuine dispute of historical fact over what exactly was said, at least as to statement one.

We agree with Mr. Nielander that ordinarily this dispute could very well be material, as Ms. Reed's and Mr. Nordell's version suggest Mr. Nielander *would* bring a gun, whereas Mr. Nielander's version, that he is not going to go to a meeting because he is afraid he would bring a gun, explains why Mr. Nielander *would not* be going to another Commissioners' meeting. Because we are asking only whether Deputy Perez is entitled to qualified immunity, however, we must look only to what information Deputy Perez possessed when he wrote the probable cause determination. Deputy Perez was unaware of Mr. Nielander's version of events prior to writing the probable cause determination. Aplt. App'x 605. Thus, the question presented is whether a reasonable officer with the information provided to Deputy Perez by Ms. Reed and Mr. Nordell could have thought true threats had been made.

For First Amendment purposes,

> we define 'threat' as a declaration of intention, purpose, design, goal, or determination to inflict punishment, loss, or pain on another, or to injure another or his property by the commission of some unlawful act. It is not necessary to show that defendant intended to carry out the threat, nor is it necessary to prove he had the apparent ability to carry out the threat. The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat and not the intention to carry out the threat that violates the law.

-20-

*United States v. Viefhaus*, 168 F.3d 392, 395-96 (10th Cir. 1999) (emphasis omitted) (citations omitted). Whether a statement constitutes a "true threat" is a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant. *United States v. Magleby*, 241 F.3d 1306, 1311 (10th Cir. 2001); *United States v. Crews*, 781 F.2d 826, 832 (10th Cir. 1986).

It is well-established that political hyperbole is protected speech, but speech on political subjects may also contain unprotected threats. *Watts v. United States*, 394 U.S. 705, 708 (1969). A true threat "convey[s] a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic . . . unpleasantly sharp attacks on government and public officials." *Crews*, 781 F.2d at 832 (internal quotations omitted). An example may be found in *United States v. Crews*. Mr. Crews, after watching a television movie about the nuclear annihilation of Lawrence, Kansas, told a nurse at the hospital in which he was staying that "[i]f Reagan came to Sheridan, [Mr. Crews] would shoot him." *Id.* at 829. The nurse reported his statement to the Secret Service. When speaking with a Secret Service Agent, he denied using those exact words, but said he hated President Reagan and said that it would be in the best interests of the nation if he were shot. *Id.* A jury found that this was a true threat; this court upheld his conviction. We held that the jury's

-21-

determination had "adequate support in the record." *Id.* at 832. That Mr. Crews' statement was conditional, was irrelevant, and although Mr. Crew's statement "had political overtones because of its context, . . . a compelling government interest in protecting the President justifies imposition of criminal liability when it is reasonably clear that the defendant was not engaged in political advocacy." *Id.*

In *United States v. Welch*, 745 F.2d 614 (10th Cir. 1984), Mr. Welch told mental health personnel that if President Reagan were in town he would get a rifle and shoot him, and that he would do a better job than Hinckley. He repeated that statement to Secret Service agents the next day. This Court upheld a jury finding that Mr. Welch had made a "true threat." Similarly, in *United States v. Martin*, 163 F.3d 1212, 1216 (10th Cir. 1998), we held that Mr. Martin made a "true threat" when he repeatedly affirmed his plans to shoot a detective. Mr. Martin had also stated his motives, the type of gun he planned to use, and his strategy for evading law enforcement. *Id.*

In contrast, the Supreme Court found the statements in *Watts v. United States* were not true threats. 394 U.S. at 706. Mr. Watts was participating in a public rally on the Washington Monument grounds. The crowd broke into small discussion groups, and Mr. Watts joined a gathering scheduled to discuss police brutality. When one member of the group said

-22-

that the young people should become more educated before expressing their

views, Mr. Watts replied,

> They always holler at us to get an education. And now I have already
> received my draft classification as 1-A and I have got to report for my
> physical this Monday coming. I am not going. If they ever make me
> carry a rifle the first man I want to get in my sights is L.B.J. They are
> not going to make me kill my black brothers.

*Id.* The Supreme Court held that "[t]aken in context, and regarding the expressly

conditional nature of the statement and the reaction of the listeners [laughter from

the crowd after the statement was made]," Mr. Watts's statement was political

hyperbole protected by the First Amendment. *Id.* at 708.

Though we recognize similarities between this case and *Watts*, we hold that

Mr. Nielander has failed to establish that a reasonable officer would necessarily

know he was not making true threats. As to his first statement, Ms. Reed and Mr.

Nordell both reported to Deputy Perez that Mr. Nielander said he *would* bring a

gun *the next time* he went to a Commissioners' meeting. Moreover, both said Mr.

Nielander was extremely agitated and yelling, and although she eventually

admitted in her deposition that she did not feel threatened, the last sentence of

Ms. Reed's written statement to Deputy Perez said, "I did feel somewhat

threatened . . . ." Aplt. App'x 633. In light of the statements' context, we cannot

say that a reasonable officer in Deputy Perez's position could not conclude that

Mr. Nielander had made a true threat.

We reach the same conclusion as to Mr. Nielander's second statement: if

-23-

"they" came to collect his taxes at his house, there would be a Ruby-Ridge-like incident. The reference to Ruby Ridge is inherently ambiguous, because this incident carries different meanings in our cultural memory. On the one hand, the reference could suggest an intention on Mr. Nielander's part to resist authorities by violence. On the other, he could have been predicting that the authorities would engage in needless violence against him and his family.[2] Because it is debatable whether a reasonable officer would consider this to be a true threat, an issue of ultimate fact, we cannot say that the applicable law is clearly established such that Deputy Perez acted unreasonably in writing a probable cause determination.

To make clear, we are not holding that qualified immunity is appropriate whenever there is an underlying question of historical fact (in this case, what Mr. Nielander actually said). Rather, we are holding that where a question of ultimate fact (in this case, whether a reasonable officer would be unreasonable in

---

[2] In 1992, a stand-off and violent confrontation occurred between U.S. Marshals and the Randy Weaver family in rural Ruby Ridge, Idaho. Randy Weaver's wife and fourteen-year-old son were killed by police, as was one U.S. Marshal. Randy Weaver and friend Kevin Harris were seriously injured. The incident is often used as an example of abuse of federal power. A task force formed by former Deputy Attorney General Phillip Heymann to investigate the FBI's actions found that the Rules of Engagement employed by the FBI officers on the scene "expanded the use of deadly force beyond the scope of the Constitution and beyond the FBI's own standard deadly force policy." DOJ Rep. on Internal Invest. of Ruby Ridge, IV.F.3(c)(3). For a detailed description of the facts surrounding Ruby Ridge, see *Harris v. Roderick*, 126 F.3d 1189, 1192–94 (9th Cir. 1997).

concluding that statement two was a true threat under clearly established federal law) cannot be resolved as a matter of law, the law is not clearly established and qualified immunity is appropriate. *See Hunter v. Bryant*, 502 U.S. 224 (1991) (holding that police officers were entitled to qualified immunity for an allegedly wrongful arrest because a reasonable officer could have believed that probable cause existed to arrest the plaintiff for making a threat on the President); *see also Anderson v. Creighton*, 483 U.S. 635 (1987) (holding that officers who participated in unconstitutional search were entitled to qualified immunity because a reasonable officer could have believed the search comported with the Fourth Amendment). Thus, Deputy Perez is entitled to qualified immunity on Mr. Nielander's First Amendment retaliation claim.

### b. Municipal Liability

The County argued below that even if Mr. Nielander's statements were constitutionally protected, it still is not liable for Attorney Spurney's or Deputy Perez's actions under the principles laid out in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (holding a municipality can only be liable under § 1983 for actions of its employees if "execution of a government's policy or custom . . . inflicts the injury"). Though the County does not renew this argument on appeal, we are free to affirm a district court decision on any grounds for which the record is sufficient to permit conclusions of law. *Sandoval*, 29 F.3d at 542 n.6. We conclude that the County cannot be held liable under a municipal liability theory.

A municipality is only liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Proving a single incident of unconstitutional conduct is not enough. Rather, a plaintiff must show that the incident resulted from an existing, unconstitutional policy attributable to a municipal policymaker. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24. Mr. Nielander argued in his response to the defendants' motion for summary judgment that Attorney Spurney had the "final authority" to "actually fil[e] the criminal charges in district court," and thus his actions subjected the County to liability. Aplt. App'x, Vol. 2, 476 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1998)).

Though we are doubtful that a prosecutor is a policymaker merely because he has discretion in deciding who to prosecute, we need not decide the issue because, regardless, Attorney Spurney is not a *municipal* policymaker. As noted above, in Kansas, county attorneys are officials of the *state*, not the county. *Schroeder*, 311 F. Supp.2d at 1254 ("Any actions by the county attorney are therefore attributable to the state, such that no liability can be imposed against the county for the county attorney's actions."); *see also McMillian v. Monroe County*, 520 U.S. 781, 785–92 (1997) (discussing why state policymakers' actions do not lead to municipal liability). Attorney Spurney admits that the County has no

-26-

authority over how he exercises his law enforcement duties; his discretionary authority does not derive from Republic County, but from the state. Aplt. App'x, Vol. 2, 521 (he testified that the County has "absolutely no control" over what he does, and he is controlled only by "the law of the State of Kansas"). Thus, the county attorney's actions cannot be attributable to the Board of County Commissioners under a municipal liability theory.

## C. State Law Claims

### 1. Immunity from State Law Claims for Deputy Perez and Ms. Reed

### a. Deputy Perez

The district court dismissed all state law claims against Deputy Perez, holding that he was entitled to law enforcement immunity under the Kansas Tort Claims Act. Tr. of Sum. Judg. Hr. 40. Under the Act, "[a] governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from: . . . (c) enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, rule and regulation, ordinance or resolution." K.S.A. § 75-6104(c). However, as both parties recognize, government employees are not entitled to immunity for willful or intentional actions.

Mr. Nielander argues on appeal that because malicious prosecution, conspiracy, and First Amendment retaliation claims involve intentional actions, no government employee should be entitled to immunity on such claims. This

-27-

argument is inconsistent with *Burgess v. West*, 817 F. Supp. 1520 (D. Kan. 1993), the precedent upon which he relies. In *Burgess*, the district court *granted* law enforcement officer immunity under K.S.A. section 75-6104(c) on both false arrest and false imprisonment claims, which are intentional torts, because the officer had probable cause and thus was enforcing a law when he arrested the defendant. *Id.* at 1526.

*Burgess* holds that immunity does not apply to willful or wanton acts by government employees. *Id.* Mr. Nielander, however, failed to show a question of fact as to whether Deputy Perez acted willfully or wantonly. Deputy Perez took the statements of Ms. Reed and Mr. Nordell and completed a Probable Cause Determination using almost the exact same language as those statements. Mr. Nielander put forth no evidence that Deputy Perez had reason to doubt the accuracy of Ms. Reed or Mr. Nordell's statements. Though Mr. Nielander speculates that Deputy Perez relied on the insults towards his father in completing the determination, mere speculation is insufficient to thwart summary judgment. *See Heffernan v. Provident Life & Accident Ins. Co.*, 45 F. Supp.2d 1147, 1149 n.2 (D. Kan. 1999). Without any evidence that Deputy Perez falsified his Probable Cause Determination, had reason to believe the statements included in it were false, or intentionally included baseless charges in it, there are no intentional actions which would preclude law enforcement immunity under Kansas law.

### b. Ms. Reed

The district court held that Ms. Reed was entitled to absolute witness immunity and discretionary immunity under Kansas law. Tr. of Sum. Judg. Hr. 45–46. Mr. Nielander argues that the district court erred in reaching both conclusions. Because we hold that Ms. Reed was entitled to absolute witness immunity, we need not address whether she is also entitled to discretionary immunity.

Generally, witnesses are entitled to absolute immunity from civil liability under Kansas law. *Allin v. Schuchmann*, 886 F. Supp. 793 (D. Kan. 1995). The only exception to this rule is for "complaining witnesses." A complaining witness is "the person (or persons) who actively instigated or encouraged the prosecution of the plaintiff." *Anthony v. Baker*, 955 F.2d 1395, 1399 n.2, 1402 (10th Cir. 1992). Such witnesses are not entitled to absolute immunity. *Id.* Mr. Nielander argues that Ms. Reed was a complaining witness, and thus not protected. We disagree.

Reporting facts to a law enforcement officer who then deems a crime to have been committed and directs the defendant's arrest is, in and of itself, insufficient to cause one to be classified as a complaining witness. *Arceo v. City of Junction City*, 182 F. Supp.2d 1062, 1087-88 (D. Kan. 2002) (citing *Barnes v. Danner*, 216 P.2d 804, 807 (Kan. 1950). According to the commentary to the Restatement (Second) of Torts section 655, "the defendant must take an active

-29-

part in [the plaintiff's] prosecution after learning that there is no probable cause for believing the accused guilty." Cmt. c.

Mr. Nielander cites to *Schuchmann* in support of his argument that "[a] person who approaches the authorities with information known to be false when there is no request for information and no ongoing investigation, then later acts as a witness for the prosecution, has instigated the criminal proceeding." Aplt. Br. 55–56. While this may be a true statement, it does not reflect the facts of this case. Mr. Nielander's counsel conceded that Ms. Reed's first contact with law enforcement was when Deputy Perez first contacted her. She did not initiate the proceedings or actively encourage them; she merely provided information to Deputy Perez when asked to do so. In fact, both parties agreed that Ms. Reed did not even know what Deputy Perez was going to do with her statement.

Because Ms. Reed merely responded to a request for information, she did not actively participate in Mr. Nielander's prosecution and thus is entitled to absolute witness immunity under Kansas law.

### 2. Supplemental Jurisdiction

Mr. Nielander argues that the district court acted improperly in considering the state law claims against Ms. Reed and Deputy Perez but declining to exercise supplemental jurisdiction over the claims against Mr. Nordell and Republic County. We review a denial of supplemental jurisdiction for abuse of discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1139 (10th Cir. 2004).

-30-

Under 28 U.S.C. §1367(c), a district court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law, it substantially predominates the claim(s) over which the district court has original jurisdiction, the district court has dismissed all claims over which it has original jurisdiction, or there are other compelling reasons for declining jurisdiction. In deciding whether to exercise jurisdiction, the district court is to consider "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Mr. Nielander relies on *Gold v. Local 7 United Food and Commercial Workers Union*, 159 F.3d 1307 (10th Cir. 1998) to argue that a court cannot exercise supplemental jurisdiction over some claims and not others. This reliance is misplaced. In *Gold*, the district court ruled on several state law claims and, in the alternative, declined to exercise jurisdiction over those *same* claims. *Id.* at 1310–11. We rejected the district court's approach because the court had not "satisf[ied] itself of subject matter jurisdiction before proceeding to the merits of the claim." *Id.* at 1309–10. In this case, the district court ruled on the claims against Ms. Reed and Deputy Perez because the judge thought they were clearly entitled to immunity; but the court declined to assert supplemental jurisdiction over the claims against Mr. Nordell and Republic County. The court conducted a separate analysis for all of Mr. Nielander's claims and decided that some warranted supplemental jurisdiction and others did not. Aple. Br. 42-43. This is

-31-

proper under 28 U.S.C. § 1367 and not inconsistent with precedent. *See, e.g.*, *Roe v. Cheyenne Mt. Conf. Resort*, 124 F.3d 1221, 1237 (10th Cir. 1997) (holding that the lower court properly ruled on some state law claims, but should have remanded one state law claim to state court); *Schartz v. Unified Sch. Dist. No. 512*, 953 F. Supp. 1208, 1218–19 (D. Kan. 1997) (exercising supplemental jurisdiction over some state law claims that were easy to resolve, but declining to exercise jurisdiction over more complex state law claims); *see also* 13D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Jurisdiction, § 3567.3, 413 (2d. ed. 2008) ("[A]lthough it is unusual, it is permissible for the federal court to decide one supplemental claim on the merits while declining to hear another supplemental claim.").

Thus, we affirm the district court's decision not to exercise supplemental jurisdiction over the claims against Mr. Nordell and Republic County even though the court addressed the claims against Ms. Reed and Deputy Perez.

### III. Conclusion

Accordingly, we **AFFIRM** the district court's judgment in favor of the defendants on all claims.