BALDOCK, Circuit Judge,
dissenting.
This is the third “true threat” case I have sat on during the past year. See also United States v. Wheeler, 776 F.3d 736 (10th Cir.2015); United States v. Heineman, 767 F.3d 970, 982-87 (10th Cir.2014) (Baldock, J., concurring in the judgment). And the decisions are not getting any easier — this thorny case being a perfect example. Here, in contrast to my colleagues, I would affirm the district court because: (1) our case law, to my knowledge, has never been extended this far; and (2) the facts of this case do not merit such an extension.
The primary issue here is simple: Could a reasonable jury find that, objectively speaking, Angel Dillard threatened Dr. Mila Means? The Court says yes. The district court saw it differently, and so do I. The key “threat” in Dillard’s letter is her statement that, should Dr. Means ever follow through on her plan to provide abortions, Dr. Means “will be checking under your ear everyday-because maybe today is the day someone places an explosive under it.” This statement was undeniably ill-advised. But was it a true threat, rather than just an ugly prediction Dillard foolishly chose to voice? See United States v. Cassel, 408 F.3d 622, 636-37 (9th Cir.2005) (“Whether the threat is of injury to person or property, there is no doubt that it must be a threat of injury brought about — rather than merely predicted — by the defendant.”). The district court classified it as a prediction, in part because the statement was: (1) conditional, hinging on actions Dr. Means may or may not take in the future; (2) not imminent, as Dr. Means was years away from acting; and (3) impersonal, as Dillard never took ownership of the actions in this sentence (nor indeed, of the entire surrounding paragraph). In response, the Court devotes a good portion of its analysis to showing that a true threat can indeed be conditional, non-imminent, or impersonal. And I would agree. But here we are dealing with a letter that is all of the above: conditional, non-imminent, and impersonal. The Court does not acknowledge this complication, much less wrestle with it.
Any such wrestling should lead to this realization: Case law does not strongly support true threat exposure in a situation this attenuated. Certainly, none of our own cases cited by the Court provide a direct factual underpinning for this holding. In our most recent published decision, we allowed the case to go to a jury where the defendant, on Facebook, urged his “religious followers” to “kill [several named] cops, drown them in tbe blood of their children, hunt them down and kill their entire bloodlines.” Wheeler, 776 F.3d at 738. Later, he posted: “to my religious followers and religious operatives, if my dui charges are not dropped, commit a massacre in the stepping stones preschool and day care [near defendant’s home], just walk in and kill everybody.” Id. Finally, he posted that “in my faith revenge is the only commandment.” Id. These posts were personal: Wheeler was calling for action, and not at all predicting the acts of an unrelated third party. Moreover, only the second post stated a condition (and therefore implied some level of delay); the first called for immediate mass murder with no strings whatsoever. In short, Wheeler bears little resemblance to our case. See also Nielander v. Bd. of Cnty. Comm’rs, 582 F.3d 1155, 1168-69 (10th Cir.2009) (reasonable officer could believe true threat had been made where “agitated” man screamed he “would bring a gun the next time he went to a Commissioners’ meeting” and if “they” attempted to collect taxes at his house it would provoke a “Ruby-Ridge-like incident”).
*1208 Going back several decades does the Court no better. In United States v. Crews, we permitted a true threat prosecution where the defendant said if President Ronald “Reagan came to Sheridan, [Kansas,] I would shoot him” because it “would be in the best interest of this nation if that red-necked, bigoted, war-mongering mother fucker were shot.” 781 F.2d 826, 829-30 (10th Cir.1986). This threat was conditional and lacked immediacy, but (like Wheeler) it in no way could have been interpreted as an impersonal prediction; rather, it was a clear first-person threat. See also United States v. Welch, 745 F.2d 614, 616 (10th Cir.1984) (upholding true threat conviction where man told mental health personnel that if President Reagan “was here, I would shoot him. I wouldn’t make the same mistake as Hinckley did. I would kill him.”). Thirteen years after Crews, we upheld a true threat conviction where the defendant stated in a publicly available message that unless “all white warriors” took action against the government within “one week from today,” bombs would be “activated in 15 pre-selected major U.S. cities.” United States v. Viefhaus, 168 F.3d 392, 394 (10th Cir.1999). That immediacy (one week!) is a far cry from this case, and the context would require a reasonable listener to assume a personal connection between the defendant and the bombs. (How would the defendant know the number and location of the bombs, otherwise?)
The Court references cases from other circuits, as well. But these cases also plainly do not involve statements that were conditional, non-imminent, and impersonal. In United States v. Turner, for example, a defendant who was furious about a recent Seventh Circuit decision. declared in a lengthy online post:
that the blood of these three judges would “replenish the tree of liberty,” that the judges “didn’t get the hint” sent by a gunman who had murdered the family of another federal judge in Chicago, that they had not “faced REAL free men willing to walk up to them and kill them for their defiance and disobedience,” that their ruling was “so sleazy and cunning as to deserve the ultimate response,” and that the judges “deserve to be killed.” The next morning Turner posted photographs, work addresses, and room numbers for each of the three judges, along with a map indicating the location of the courthouse in which they worked, and a photograph of the building modified to point out “Anti-truck bomb barriers.”
720 F.3d 411, 413-14 (2d Cir.2013). This is coordination, not prediction. Nor is it conditional in the least, or futuristic. Turner threatened murder, and he wanted it done now. Similar to Turner is United States v. Schneider, 910 F.2d 1569 (7th Cir.1990). There, the defendant wrote to the Illinois Supreme Court: “I remind you again, that this ‘Idiota Persona Non Grata’ [a trial court judge] is of your problem and if [he] is allowed to continue to be mine, he will be executed.... ” Id. at 1570 (emphasis added). Although phrased passively this is still plainly a first-person threat; the judge is giving this defendant problems, and if the judge is not stopped, execution awaits. Also distinguishable is United States v. Alaboud, where the defendant in a multitude of phone calls “generally promised retribution upon [his former attorney] Blake, [Blake’s] law firm, the population of Florida and the Jewish people if [the defendant] was not refunded his retainer .... [For example, the defendant] told the firm’s answering service that ‘Ax and sledgehammers would be utilized to make justice.’” 347 F.3d 1293, 1295-96 (11th Cir.2003). Needless to say, promising murderous retribution against your former attorney over a retainer is almost the definition of a personal threat.
*1209 One case from the Ninth Circuit deserves particular attention, because it also involved abortion and FACE. See Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058 (9th Cir.2002). There, in a 6-5 en banc decision, the Ninth Circuit upheld a civil FACE action against a pro-life organization that had published, inter alia, “WANTED” posters listing abortion doctors and had crafted a “ ‘Nuremberg Files’ website displaying the names of abortion rights supporters with the names of those previously killed crossed out....” Wheeler, 776 F.3d at 744 (citing Planned Parenthood, 290 F.3d at 1075, 1080). Past a superficial resemblance, however, differences abound between Planned Parenthood and this case. To begin, publishing a “WANTED” poster to the world strongly implies, at minimum, that the publisher wants immediate and unconditional action — factors which are not present here. In addition, the Ninth Circuit grounded its decision on “the previous pattern of WANTED’ posters identifying a specific physician followed by that physician’s murder.” Planned Parenthood, 290 F.3d at 1063 (emphasis added). Thus, like the other cases listed above, it would be impossible to maintain with a straight face that the “WANTED” poster and “Nuremberg Files” website were mere predictions about the activities of others. That is not the case here.
Indeed, the facts here more closely resemble United States v. Lincoln, where the Ninth Circuit held that a letter to President George W. Bush describing his upcoming assassination was not a true threat. See United States v. Lincoln, 403 F.3d 703, 705 (9th Cir.2005) (Statement: “You [President Bush] will see a good Job Done agin may 2 week’s, maybe 2 months, 3, who know’s. You Will Die too George W. Bush real Soon They Promised That you would Long Live BIN LADEN.” (emphasis added)). To distinguish Planned Parenthood, the Ninth Circuit wrote the following, which essentially forecloses applying Planned Parenthood against Dillard:
Lincoln’s letter differs from the “wanted” posters in Planned Parenthood because in that case there was a clear pattern of appearance on a poster followed by murder. It was this “poster pattern” that gave the otherwise innocuous posters their threatening portent. In this case, there is no pattern of letters written by Lincoln, followed by murder or any other act. There was only one letter written by Lincoln. Unlike the single letter in this case, the “wanted” posters were publicly posted on the internet, and thus could be reasonably interpreted as a signal to unknown third parties to target those who appeared on the posters. In contrast, Lincoln’s letter was to be sent only to President Bush: In no way could the letter be reasonably viewed as a signal to A1 Qaeda or anyone else to carry out an attack upon President Bush.
Id. at 707 (emphases added). Just like Lincoln, we have no murderous letter pattern or public signaling here. Rather, we too have a single letter sent to a single recipient, containing a description of potential future violence phrased impersonally-
Let us shift gears, though. I will readily concede that a case need not be on all fours with a prior precedent before we can send it to the jury. After all, true threats can be found in many shapes and sizes, and they must be analyzed based on the entire factual context of a case. I will also concede there are likely situations where a jury could find that a conditional, non-imminent, and impersonal statement was a disguised true threat. Cf. United States v. Local 30, United Slate, Tile & Composition Roofers, Damp & Waterproof Work *1210 ers Ass’n, 686 F.Supp. 1139, 1149 (E.D.Pa.1988) (“Daly threatened John Wanner ... Daly said: Well, you better become union or something could happen to your truck. It would be a. shame if something happened to your truck.’ ” (emphases added)). With all this conceded, I still am not convinced the Government has demonstrated this case to be such a scenario.
I begin with the letter itself. To be sure, Dillard did herself no favors with her acrimonious rhetoric. That said, the key statement — that “maybe today is the day someone places an explosive under [your car]” — is smack in the middle of a large, impersonal paragraph listing a dozen or so “consequences” that will occur if Dr. Means ever performs abortions. Crucially, a number of these events could not possibly be performed by Dillard or someone in her control. For example, Dillard concludes this list by emphasizing that Dr. Means’ dreams “will be haunted by bloody, squirming, dismembered babies.” Is Dillard objectively threatening to haunt Dr. Means in her sleep, á la Freddy Krueger, with visions of aborted children? Of course not. She is just predicting what she thinks Dr. Means’ own brain may do to her, presumably trying to frighten her out of providing abortions. This is not illegal. See, e.g., New York ex rel. Spitzer v. Operation Rescue Nat’l, 273 F.3d 184, 196 (2d Cir.2001) (“[Generally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear.”). But to hold as the Court does — that Dillard’s car-bomb statement is a threat— logically implies that Dillard’s “haunted” warning and other surrounding comments are also somehow threats. This seems to abuse the immediate context, rather than use it.
The broader context does not help the Court much, either. The Court relies heavily on the news article informing Dr. Means that Dillard associated with convicted murderer Scott Roeder. See Op. at 1202. (Indeed, the Court strongly implies that without Dr. Means being informed of this connection, Dillard’s letter would not have qualified as a true threat.) This reliance is problematic on several levels. For starters, as the Court itself notes, the article is not in the record. See id. at 1197 n. 1. For whatever reason, the Government has not provided it. So, with the pivotal contextual clue in this case nowhere to be found, the Court is forced to rely on Dr. Means’ testimony about the article in order to send Dillard’s case to a jury. See id. at 1197 (“This article apparently reported that Defendant had befriended Mr. Roeder____” (emphasis added)). This adds yet another (very uncomfortable) layer of doubt to these proceedings. In any event, even assuming the article said what it reportedly said, the Government’s case is not improved to any great degree. This is because even Dr. Means admits the article stated Dillard and her husband had “no plans to do anything of violence to anyone.” Id. (emphasis added). As such, I believe the district court got it right:
While Dr. Means learned from some reports that Dillard admired Roeder’s convictions, the very same sources explain that Dillard- has publicly deplored his violent actions. There is nothing in the evidence before the court showing that Dillard ever supported Roeder’s violent action.
United States v. Dillard, 989 F.Supp.2d 1169, 1175 (D.Kan.2013) (emphasis added).
In its analysis, the Court does not mention Dillard’s highly significant public disavowal of Roeder’s violence. This seems to be a trend, rather than an aberration, as the Court glosses over a number of contextual clues that favor Dillard here. I will name just a few. First, the Court does-not *1211 analyze the fact that neither the FBI nor the Wichita Police Department viewed Dillard’s letter as a threat.[1] Law enforcement reaction alone may not be decisive, but it is highly indicative of what a reasonable person would believe. See Fogel v. Collins, 531 F.3d 824, 832 (9th Cir.2008) (“The actions of the officers who actually saw the van and its message make clear that reasonable people would not have understood — and did not understand — 'the speech as a true threat.”). The Court also omits from its analysis any discussion about Dillard’s mailing the letter in an envelope bearing her own name and return address; which would hardly be prudent for someone intending to issue a legitimate threat. Nor does the Court acknowledge — in background or analysis — that Dr. Means openly admitted that “Dillard’s warning letter is similar in content to what she had heard from family and friends!” Dillard, 989 F.Supp.2d at 1175. All this context, combined with the other concerns I raised above, leads me to disagree with the Court.
In the end, Dillard’s crude rhetoric and the general preference for juries make this a tricky case. As I have demonstrated, though, the Court is on very shaky ground — in terms of precedent and factual context — when it sends this case to the jury. And shaky ground is not a desirable place to be, especially when a core First Amendment right is involved. As such, I cannot join the Court. See Wheeler, 776 F.3d at 742 (an “unusual set of facts” may preclude a true threat question from being sent to a jury). With all respect to my colleagues who see it differently, I dissent.[2]

. In its background section, the Court mentions that the "FBI did not take any of the follow-up actions they would have taken had they determined Defendant to be a threat.” Op. at 1197. The Court never brings this up in its analysis, however. The Wichita police report — which the Court does not mention at all, in background or analysis — stated that “there was not a direct threat against ... Dr. Means.” Dillard, 989 F.Supp.2d at 1172.

. Because I would affirm the district court, I would not reach the issues of subjective intent and statutory standing.