FILED
United States Court of Appeals
Tenth Circuit

January 15, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

KENNETH ROYAL WHEELER,

Defendant - Appellant.

No. 14-1031

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:12-CR-00138-WJM-1)**

O. Dean Sanderford, Assistant Federal Public Defender (and Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant - Appellant.

James C. Murphy, Assistant United States Attorney (and John F. Walsh, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff - Appellee.

Before **KELLY**, **BALDOCK**, and **EBEL**, Circuit Judges.

**KELLY**, Circuit Judge.

Kenneth Wheeler was convicted of two counts of transmitting a threat in foreign commerce under 18 U.S.C. § 875(c) based on Facebook posts that called

upon his "religious followers" to carry out violent acts. Count One of the indictment referenced Mr. Wheeler's "wrath commands" to kill law enforcement officers and children. 1 R. 27. Count Two referenced Mr. Wheeler's instructions to kill law enforcement officers, politicians, judges, district attorneys, public defenders and their children. Id. at 28. Mr. Wheeler was sentenced to forty months' imprisonment on each count to run concurrently, and three years' supervised release on each count, also to run concurrently. On appeal, Mr. Wheeler argues that his convictions must be reversed because: (1) the jury was not properly instructed that it had to find Mr. Wheeler had a subjective intent to threaten in order to convict; and (2) the evidence was insufficient to support a finding that Mr. Wheeler transmitted a "true threat." We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse for a new trial because the jury was not properly instructed. We are not persuaded that the evidence was insufficient to convict.

Background

Mr. Wheeler has strong anti-government views and became angry at certain police officers in Grand Junction, Colorado, because of, among other things, a DUI arrest that he viewed as a set-up. On March 12, 2012, Mr. Wheeler, while in Italy, posted a statement to his Facebook page urging his "religious followers" to "kill cops. drown them in the blood of thier [sic] children, hunt them down and

kill their entire bloodlines" and provided names. Gov't Ex. 8g. Four days later, on March 16, 2012, Mr. Wheeler posted again from Italy: "to my religious followers and religious operatives. if my dui charges are not dropped, commit a massacre in the stepping stones preschool and day care, just walk in and kill everybody." Id. Mr. Wheeler lived two to three blocks away from the Stepping Stones daycare center.

In addition, the government introduced evidence of a third Facebook post by Mr. Wheeler on March 17, 2012, his "last mean update, once i can't do this in america." Id. In this post, which was not the basis of a charge, Mr. Wheeler stated that "in my faith revenge is the only commandment." Id.

Each post appeared as a "status update" on Mr. Wheeler's page, which a Facebook custodian explained is "when a user posts what they are thinking or how they are feeling on their own wall to share with their friends and family." 3 R. 220–21. According to Facebook's records, Mr. Wheeler's status updates could be viewed by his "friends and networks." Id. at 224. There is no evidence Mr. Wheeler was a member of any "networks" at the times he posted the status updates. But, two officers testified that they viewed Mr. Wheeler's Facebook page on March 16 and thought he had friends listed on the page. Further, Facebook records indicated that on March 17, Mr. Wheeler removed ten Facebook friends, which suggests that he had these friends when he posted the March 12 and March 16 status updates.

After his arrest, Mr. Wheeler told the police that he thought he had deleted all of his Facebook friends prior to posting the status updates. The district judge, who listened to a recording of Mr. Wheeler's interview, believed Mr. Wheeler was operating under the "mistaken belief" that nobody would see his Facebook posts. Id. at 562. Mr. Wheeler further explained that he had no "religious followers"; indeed, the district court found "no evidence in the record at all from which anyone can reasonably conclude that such individuals ever existed." Id. at 550. When the police asked Mr. Wheeler why he made the posts, he said, "I was just basically trying to stick it to the man and say f*** you." Id. at 292. When Mr. Wheeler was asked how he would feel if somebody had carried out his orders, he responded that he "would probably have a wide spectrum of mixed emotions"; he would "feel bad if people got hurt," but also would "want to point [his] middle finger at—in the face of people—certain people and say, That's what you get for all of the terrorism that you did to me." Id. at 293.

One of the individuals referenced in Mr. Wheeler's posts came across the posts on Facebook. The man knew Mr. Wheeler because he worked as a bouncer at a pub Mr. Wheeler frequented. He testified that, in his experience, Mr. Wheeler was "loud and mouthy," but had not been violent. Id. at 181–82. Nevertheless, the posts worried him and he called the police. He did not interpret the posts to be a joke and could not understand how anybody would. The other individuals mentioned in Mr. Wheeler's posts were notified by the police. One of

the men, an employee at the same bar, testified that the posts made him concerned for his safety. He knew that Mr. Wheeler was "not right in the head," and was concerned because "there are other people in the world that I don't necessarily trust." Id. at 207.

One of the threatened police officers lived right next to the Stepping Stones preschool and testified that he had "never seen something like this" in his eight years in law enforcement and that it was "chilling" and "crossed the line." Id. at 299. When he told his wife of the threats, she wanted "to go out and, you know, get comfortable using a firearm." Id. at 300. Another officer knew Mr. Wheeler and thought he was "a nut to the point where he was violent and could be a danger to [his] family." Id. at 305. This officer went to his church and children's school to warn the pastor and teachers about the posts and made sure that his wife was armed. A third officer spent the day patrolling the area around Stepping Stones daycare.

Mr. Wheeler was charged under 18 U.S.C. § 875(c), which states in relevant part: "Whoever transmits in interstate or foreign commerce any communication containing . . . any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." At trial, Mr. Wheeler submitted two proposed instructions on the elements of the offense, both which required the jury to find that "Mr. Wheeler understood and meant the words as a true threat." 1 R. 360–61. The government objected to the proposed

instruction, arguing that it "improperly makes 18 U.S.C. § 875(c) a specific intent crime rather than the general intent crime that it is." Doc. 142 at 1. It asserted that only the Ninth Circuit required subjective intent to threaten and that the Tenth Circuit had rejected such an approach. Id. at 1–2. The court agreed, rejected the defendant's proposed instructions, and instead defined a "threat" as:

> a declaration of intention, purpose, design, goal or determination to inflict punishment, loss or pain on another, or to injure another or his property, by the commission of some unlawful act. A true threat is a serious threat, not political argument, idle talk or something said jokingly; that is, made under circumstances that would lead a probable [sic] person,[1] who hears or reads the threat, to believe that the defendant intended to injure another person.

3 R. 442. As to the requisite state of mind, the court instructed the jury:

> Whether the defendant intended or had the ability to carry out the threat is not relevant. The inquiry is how a reasonable person would have perceived the threat.

Id. Thus, the court did not instruct the jury that in order to convict, it had to find that Mr. Wheeler subjectively intended to threaten anyone.

### Discussion

A.      Jury Instructions

Mr. Wheeler first argues that his conviction should be reversed because the

---

[1] The written jury instructions refer to a "reasonable person," not a probable person. 1 R. 467.

district court erroneously refused to instruct the jury that, in order to convict, it had to find that Mr. Wheeler subjectively intended the posts to be threatening. This court recently held in United States v. Heineman, 767 F.3d 970 (10th Cir. 2014) that § 875(c), in accord with the First Amendment, requires proof of a defendant's subjective intent to threaten. While the government maintains Heineman was wrongly decided, Aplee. Br. 23 n.7, it concedes that under current Tenth Circuit law, Mr. Wheeler's jury instructions were flawed.[2] Nevertheless, the government contends that the conviction should be affirmed because the faulty instructions were harmless error.

Where an element is improperly omitted from a jury instruction, we must reverse unless "it [is] clear beyond a reasonable doubt that a rational jury would

---

[2] Because the Supreme Court recently granted certiorari on a case from the Third Circuit addressing this precise issue, see Elonis v. United States, 730 F.3d 321 (3d Cir. 2013), cert. granted, 134 S. Ct. 2819 (June 16, 2014) (No. 13–983), the government also suggests that this court "may wish to await the Supreme Court's decision before deciding Mr. Wheeler's case." Aplee. Br. 23 n.7. This court rejected a similar argument in Heineman, noting that the Elonis decision "may not be handed down until next June, and there is always the possibility that an unexpected problem with the case will cause the Supreme Court not to proceed with its review." 767 F.3d at 971 n.1. Though in Heineman the defendant was only on probation, and thus would "not suffer as much in the interim as one who has been incarcerated," the court concluded that "probation is not an insignificant sanction" and resolved the appeal. Id. Here, Mr. Wheeler is imprisoned and thus has an even stronger claim for quick resolution of his case than did the defendant in Heineman. Further, Mr. Wheeler challenges the sufficiency of the evidence supporting his conviction. Success on this claim would prevent Mr. Wheeler's retrial, see Burks v. United States, 437 U.S. 1, 18 (1978), and thus this court would need to address it regardless of the result in Elonis. These factors persuade us that we should not delay resolution of this case.

- 7 -

have found the defendant guilty absent the error." Neder v. United States, 527 U.S. 1, 18 (1999); see also United States v. Sierra-Ledesma, 645 F.3d 1213, 1217 (10th Cir. 2011). The government contends that no rational juror could conclude, based on the evidence presented, that Mr. Wheeler did not subjectively intend for his remarks to be threatening. We disagree.

First, Mr. Wheeler stated that he believed he had no Facebook friends at the time he posted the status updates. A rational juror could certainly believe, as the district court apparently did, 3 R. 562, that Mr. Wheeler honestly thought nobody would see his posts. Second, Mr. Wheeler had no religious followers, and a rational juror could consider that fact in deciding whether Mr. Wheeler had an intent to threaten.

The government suggests that several undisputed facts conclusively show that Mr. Wheeler intended to instill fear in the individuals he mentioned in his Facebook posts. First, the government points to Mr. Wheeler's statement in his first post that "the americans cant punish me for what i say here in rome italy on facebook." Aplee. Br. 24. But Mr. Wheeler's vague sense that his statements would be illegal if made in the United States does not conclusively reveal whether he intended them to be threatening. Second, the government argues that because the jury was instructed that it had to find that Mr. Wheeler acted "purposely, with the intent to do something that the law forbids," the guilty verdict was "tantamount" to a finding that Mr. Wheeler intended his posts to be threatening.

- 8 -

Id. But once again, the jury's finding that Mr. Wheeler intended to break the law does not conclusively establish that he intended for the parties mentioned to feel threatened.

Finally, the government asserts that Mr. Wheeler's "revenge motive," evidenced by his post-arrest interrogation, shows his intent to threaten. Id. at 25. Mr. Wheeler's statement that he was "trying to stick it to the man and say 'f\*\*\* you'" and the satisfaction Mr. Wheeler stated he would receive from somebody carrying out his orders certainly are the types of circumstantial evidence relevant to a jury's determination of whether an individual acted with the requisite intent. See Wingfield v. Massie, 122 F.3d 1329, 1333 (10th Cir. 1997). The government can certainly argue this to the jury, but that does not resolve the issue. This is not an instance where an omitted element was "supported by uncontroverted evidence," Neder, 527 U.S. at 18; thus, the issue of intent must be determined by a jury upon retrial given our resolution of the sufficiency issue.

B.    Sufficiency of the Evidence

Mr. Wheeler also contends that the evidence was insufficient to support his conviction under § 875(c) because his Facebook posts do not express his own intent to do violence. We must address Mr. Wheeler's sufficiency challenge because, if successful, it would prevent his retrial. See Burks v. United States, 437 U.S. 1, 18 (1978).

1.    Standard of Review

As a preliminary matter, the parties disagree as to the proper standard of

review for Mr. Wheeler's sufficiency challenge. Generally, this court reviews claims of evidentiary sufficiency under a deferential standard, "view[ing] all the evidence, direct and circumstantial, together with all reasonable inferences therefrom, in the light most favorable to the prosecution." United States v. Leaverton, 835 F.2d 254, 255 (10th Cir. 1987). The proper inquiry, in such cases, is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

However, the Supreme Court in Bose Corp. v. Consumers Union of United States, Inc. set forth an exception to this rule applicable where a defendant argues his speech is protected by the First Amendment. 466 U.S. 485 (1984). In such cases involving "constitutional facts," id. at 508 n.27, reviewing courts must undertake an "independent review" of the record to ensure the speech actually qualifies as unprotected speech. Id. at 505. This independent review does not alter the established rule that reviewing courts cannot overturn factual findings unless "clearly erroneous" or second-guess a jury's credibility determinations. Id. at 500–01 (citing Fed. R. Civ. P. 52(a)). Rather, it simply directs reviewing courts to determine for themselves whether the fact-finder appropriately applied First Amendment law to the facts. Id.; see also Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557, 567 (1995) ("This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional

protection.").

Though Bose dealt with the actual malice standard in defamation actions, Mr. Wheeler contends that independent review applies here, as he argues his posts do not fall within the "true threat" category of unprotected speech. The Fourth and Ninth Circuits have held the doctrine of independent review of constitutional facts to apply to "true threat" cases, see United States v. Bly, 510 F.3d 453, 457–58 (4th Cir. 2007); Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1070 (9th Cir. 2002), but several other courts review true threat cases under the traditional deferential standard. See United States v. Jeffries, 692 F.3d 473, 481 (6th Cir. 2012); United States v. Parr, 545 F.3d 491, 497 (7th Cir. 2008); United States v. Schiefen, 139 F.3d 638, 639 (8th Cir. 1998); see also United States v. Turner, 720 F.3d 411, 419 (2d Cir. 2013) (noting uncertainty in the doctrine's application to true threat cases).

This court has not relied upon Bose in "true threat" cases and has consistently stated that "whether a defendant's statement is a true threat or mere political speech is a question for the jury." United States v. Viefhaus, 168 F.3d 392, 397 (10th Cir. 1999); see also Leaverton, 835 F.2d at 255. Of course, "[i]f there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law." Viefhaus, 168 F.3d at 397. But, absent an "unusual set of facts," the question whether statements amount to true threats "is a question generally best left to a jury." United States v. Malik, 16 F.3d 45, 51 (2d Cir. 1994).

- 11 -

2.     Sufficiency of the Evidence

Section 875(c), like all threat statutes, "must be interpreted with the commands of the First Amendment clearly in mind." Watts v. United States, 394 U.S. 705, 707 (1969). Thus, such statutes apply only to "true threat[s]"—i.e., threats outside the protective scope of the First Amendment. Viefhaus, 168 F.3d at 397. The Supreme Court in Virginia v. Black defined "true threats" as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. 343, 359 (2003). Such a threat must be "a serious threat as distinguished from words as mere political argument, idle talk or jest." Leaverton, 835 F.2d at 256.

In distinguishing between "true threats" and protected speech, this court asks "whether those who hear or read the threat reasonably consider that an actual threat has been made." Viefhaus, 168 F.3d at 396; see also United States v. Magleby, 241 F.3d 1306, 1311 (10th Cir. 2001) ("In determining the existence of a threat . . . this circuit had adopted an objective test, focusing on whether a reasonable person would find that a threat existed.").[3] Thus, it is not necessary to

---

[3]     This court's recent decision in Heineman does not alter this standard. Heineman dealt solely with the mens rea required under § 875(c) and does not alter the objective, reasonable person standard for determining what constitutes a true threat. 767 F.3d at 972 ("[T]he statement itself must be one that a reasonable person in the circumstances would understand 'as a declaration of intention, purpose, design, goal, or determination to inflict [bodily injury] on another.'" (quoting Viefhaus, 168 F.3d at 395)). Instead, Heineman simply added a separate element the government must prove—that the defendant possessed a subjective

show that a defendant intended to or had the ability to actually carry out the threat. Viefhaus, 168 F.3d at 395–96. Determining whether a statement amounts to a true threat requires "a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant." Nielander v. Bd. of Cnty. Comm'rs, 582 F.3d 1155, 1167–68 (10th Cir. 2009); see also Magleby, 241 F.3d at 1311 (the "reaction of the recipient of the alleged threat" is relevant in determining whether a reasonable person would interpret a statement to be a threat).

      a.    Can Exhortations Constitute Threats?

Mr. Wheeler contends that the evidence is insufficient to support his conviction under § 875(c) because his posts did not state his own intention to harm anyone—whether directly or through a party subject to his control; instead, the posts merely call upon Mr. Wheeler's non-existent "religious followers" to take violent action. Mr. Wheeler relies chiefly on two cases: United States v. White, 670 F.3d 498 (4th Cir. 2012), and United States v. Bagdasarian, 652 F.3d 1113 (9th Cir. 2011). In White, the leader of a white supremacist organization was convicted under § 875(c) based on posts urging others to kill a Canadian civil rights attorney. 670 F.3d at 506. The Fourth Circuit held that the evidence was insufficient to support Mr. White's conviction because neither of the defendant's posts expressed the defendant's own intent to kill the attorney. Id. at 513. The

intent to threaten.

court explained that the posts could have constituted threats if the defendant "had some control over those other persons" of "if [the defendant's] violent commands in the past had predictably been carried out," but found no evidence of that context. Id.

Similarly, in Bagdasarian, the defendant was convicted based on two posts to an online financial discussion board shortly before Barack Obama's election, one which stated "shoot the nig country fkd for another 4 years." 652 F.3d at 1115. The Ninth Circuit found "no explicit or implicit threat on the part of Bagdasarian that he himself [would] kill or injure Obama," id. at 1119, but instead just an "imperative that some unknown third party should take violent action." Id. at 1122.

Relying on White and Bagdasarian, Mr. Wheeler urges this court to adopt a bright-line rule: exhortations to unspecified others to commit violence cannot amount to true threats. We reject that position as inconsistent with this court's established precedent. We have consistently held that statements amount to true threats when a reasonable person would interpret the statements to be threats—a "fact-intensive" inquiry. Nielander, 582 F.3d at 1167. Especially where, as here, a reasonable person might believe the individuals ordered to take violent action are subject to the will of the threatening party, such exhortations may amount to true threats.

Other courts have reached similar conclusions. In United States v. Turner, the defendant published a blog post listing certain Seventh Circuit judges who

"deserve[d] to be killed" and subsequently provided their photographs, work addresses, and room numbers along with a map that pointed out the courthouse's anti-truck bomb barriers. 720 F.3d 411, 413–14 (2d Cir. 2013). The post suggested these judges "didn't get the hint" from the earlier murder of a federal judge's family members. The defendant argued that because he did not specifically state that *he* would kill certain judges, his statements were not threats. Id. at 421–22. The court rejected this argument, noting that such an interpretation "would render the [threat] statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Id. (quoting Malik, 16 F.3d at 50).

Likewise, in Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists (ACLA), four physicians brought suit under the Freedom of Access to Clinics Entrances Act (FACE) against the ACLA, a pro-life organization. 290 F.3d 1058, 1062 (9th Cir. 2002) (en banc). In the wake of the murder of several abortion doctors that had been listed on pro-life "Wanted" posters, the ACLA published "Deadly Dozen" posters listing the names of the plaintiffs and deeming them "Guilty of Crimes Against Humanity." In addition, the ACLA published a "Nuremberg Files" website displaying the names of abortion rights supporters with the names of those previously killed crossed out and those wounded greyed out. The ACLA argued the posters and website constituted protected speech, as they did not actually threaten anyone. The Ninth Circuit en banc rejected this position, emphasizing that "threats should be

- 15 -

considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." Id. at 1075 (citation omitted). The Ninth Circuit held that given the recent violence against abortion doctors featured on other wanted-type posters, the posters and Nuremberg Files website constituted true threats. Id. at 1080.

Mr. Wheeler contends that interpreting true threats to include such exhortations would "effectively abolish the constitutional distinction between threats and incitement to violence." Aplt. Br. 34. Under Brandenburg v. Ohio, incitement speech is unprotected only if it is "directed to inciting or producing *imminent* lawless action and is *likely* to incite or produce such action." 395 U.S. 444, 447 (1969) (emphasis added). Mr. Wheeler argues that treating his statements as true threats creates an end-run around the stringent Brandenburg requirements and permits incitement to be charged under the more lenient threat standard. But the line between threats and incitement, especially in cyberspace,[4] is not as clear as Mr. Wheeler contends, and no court has suggested that the categories of unprotected speech are completely distinct from one another. Speech

---

[4] Several attributes of the Internet substantially amplify the fear an individual can instill via threats or incitement. Such threats have the ability to reach a vast audience—far more than the traditional speaker or author published in a single venue. The threats may often come cloaked in anonymity, allowing authors to make menacing statements they would never consider making to an individual in person. And, given the prevalence and diversity of Internet fora and discussion boards, such exhortations may often find a receptive audience of like-minded individuals—perhaps audiences more willing to do the bidding of one urging violent action.

such as Mr. Wheeler's may at first blush appear to be closer to incitement, but fits squarely within the rationale for excluding true threats from First Amendment protection. Prohibiting true threats "protect[s] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388 (1992). Exhorting groups of followers to kill specific individuals can produce fear in a recipient no less than more traditional forms of threats. Allowing defendants to seek refuge in the First Amendment simply by phrasing threats as exhortations would, as the Turner court observed, leave the state "powerless against the ingenuity of threateners." 720 F.3d at 422. We cannot endorse so wooden an interpretation of the term "threat."

      b.     Reasonable Person Standard

Concluding that such exhortations are not categorically excluded from the realm of true threats, we must still address whether a reasonable person would interpret Mr. Wheeler's Facebook posts to be serious threats, in light of the full context in which the posts were made, including the reaction of the recipients. Nielander, 582 F.3d at 1167–68; see also Watts v. United States, 394 U.S. 705, 708 (1969) (considering, among other things, "the reaction of the listeners" in determining what constitutes a true threat). Mr. Wheeler's March 12 post calls upon his "religious followers" to "kill all the children of [a police officer's] blood line[]." It directs these followers to "eradicate [another officer's] blood line children first." He makes similar commands with regards to two other individuals.

- 17 -

"[I]f u have to walk right in to anywhere, church, hospitals, terrorist trianing [sic] facilities and lodge claw hammers into the back of thier [sic] heads. rite on," Mr. Wheeler explained. In his March 16 post, Mr. Wheeler directed his "religious operatives" to, if his DUI charges were not dropped, "commit a massacre in the stepping stones preschool and day care, just walk in and kill everybody. . . if you have to bomb,em, set them on fire."

A rational juror considering the language and context of these posts could consider them to be true threats. Mr. Wheeler's posts command his religious followers to take specific, deadly action against a number of individuals—from policemen, to ordinary civilians, to children at a daycare center less than three blocks from Mr. Wheeler's home. We think the full context of the posts includes the collective consciousness which includes recent massacres at educational and other institutions by active shooters. A reasonable person could conclude that the posts are not mere "political argument, idle talk or jest," Leaverton, 835 F.2d at 257, but rather calculated, serious directives to kill. Mr. Wheeler's posts do not simply *imply* that some individuals should be killed; they *explicitly* call for the killing of a number of individuals. Moreover, the posts do not merely state an "imperative that some unknown third party should take violent action," Bagdasarian, 652 F.3d at 1122; instead, they call upon a specific party or parties presumably subject to Mr. Wheeler's control.

Mr. Wheeler places dispositive weight on the fact that he had no religious followers to carry out his commands. Aplt. Br. 29–30. Mr. Wheeler concedes that

had he "direct[ed] anyone under his control" to do violence, his posts would have amounted to true threats. Id. at 26. But, he argues, because he in fact had no religious followers, his posts could not amount to threats. But the appropriate inquiry is not whether Mr. Wheeler in fact had religious followers, or whether he believed he had religious followers, but whether a reasonable recipient of the threat could have so thought. See Nielander, 582 F.3d at 1167. Suffice it to say, a reasonable person could conclude that ordering followers to "commit a massacre" at a preschool implies their existence.

Though certainly not dispositive, the parties referenced in Mr. Wheeler's posts were in fact frightened. One officer called the posts "chilling" and explained that he had never seen statements like Mr. Wheeler's in his law enforcement career. When this officer told his wife of the threats, she wanted to "go out and, you know, get comfortable using a firearm." 3 R. 300. Another officer, upon learning of the threats, went to his church and children's school and warned the pastor and teachers of Mr. Wheeler's posts. He ensured that his wife was armed. Id. at 306–07. The other individuals mentioned in the posts were also concerned—one enough so that he called the police. In light of the nature of Mr. Wheeler's posts, and Mr. Wheeler's home's proximity to the preschool, we find these reactions to be eminently reasonable.

We cannot say that no rational juror could find Mr. Wheeler's statements to be true threats. Accordingly, the evidence was sufficient and Mr. Wheeler may be retried.

REVERSED and REMANDED for retrial with proper instructions.