**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROCCO TINOCO,

    Defendant - Appellant.

No. 17-2059
(D.C. No. 2:15-CR-01703-DN-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **McKAY**, and **KELLY**, Circuit Judges.
_____

    A jury convicted Rocco Tinoco of six counts of threatening a federal official in violation of 18 U.S.C. §§ 115(a)(1) and (b)(4), and four counts of using the internet to communicate a threat in violation of 18 U.S.C. § 875(c). He was sentenced to 63 months' imprisonment to be followed by three years of supervised release. Tinoco, appearing pro se, appeals. We exercise jurisdiction under 28 U.S.C. § 1291, and affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

Tinoco was initially determined to be incompetent to stand trial. After eventually being restored to competency, he appeared at a status conference in June 2016. The district court set trial for October. The trial began as scheduled with Tinoco appearing pro se, but shortly thereafter, Tinoco asked his stand-by counsel to step in and defend the case.

The evidence established that Tinoco sought to call attention to his grievances with marijuana laws by falsely reporting to United States Border Patrol Agents that he had a load of marijuana in his truck. Tinoco's encounter with border patrol agents began when he drove his truck southbound through a non-controlled border checkpoint in Deming, New Mexico. After passing through the checkpoint, Tinoco made a U-turn and entered the northbound checkpoint—a controlled area. Tinoco advised the agent at the primary stop that he wanted to speak with patrol agents, and the agent directed him to an area where he could pull over.

Tinoco exited his truck and told the agents that he was recording the conversation and that he might have a pound of marijuana in his truck. Based on this statement, the agents, including Agent R.F., began searching his vehicle. Tinoco continued talking to agents as he observed the search. Among other things, Tinoco questioned their authority to conduct the search or enforce the laws prohibiting the possession or trafficking of marijuana.

Agent R.F. testified that Tinoco said "if [the agents] were iron deficient, he had banana clips for us, and he could give us iron and potassium. And I took the

2

banana clip and all that to—a banana clip is a magazine for a gun, and the iron, I'm guessing he was talking about bullets." R., Vol. III at 44. R.F. also testified that Tinoco told him "I'm going to have your head, [R.F.]." *Id*. at 45.

R.F. conceded that Tinoco sometimes used the phrase "figuratively speaking," but R.F. "didn't think [Tinoco] was joking." *Id*. at 46. When confronted with the fact that some other agents joked with Tinoco during the encounter, R.F. said he nonetheless "took what [Tinoco] was saying was serious . . . I have to take those threats seriously." *Id*. at 108. Tinoco wasn't "smiling" when he made the statements. *Id*. at 46. The agents found no marijuana or other contraband in Tinoco's truck, and they permitted him to leave after a supervisor decided not to arrest him. Later that day, Tinoco posted comments about R.F. on Facebook.

Two days after the checkpoint encounter, R.F. saw Tinoco as R.F. shopped with his family at the local Wal-Mart store. R.F. told his family to leave the store and he approached Tinoco. According to R.F., he told Tinoco to stop threatening him on Facebook, and Tinoco responded "[l]et's have a shootout and end this right now. . . . I've been at shootouts before. I know what I'm doing." *Id*. at 61. R.F. described Tinoco's demeanor as "serious" and "angry," and R.F. believed Tinoco. *Id*.

The following day, Tinoco posted a message on Facebook directed to the supervisor who was at the Deming checkpoint just a few days earlier: "I can be sure to come at your brain with a hammer drill as if I was searching for fucking gold." *Id*. at 164.

3

Based on Tinoco's statements, the government began an investigation and sought a search warrant for the recording device Tinoco used at the checkpoint. To that end, a United States magistrate judge authorized a warrant to search Tinoco's home.

Federal Bureau of Investigation Special Agent Downey participated in the search. During the search, Downey asked Tinoco about his posts on Facebook and whether people who received them would feel threatened. Tinoco said: "Of course they would." *Id*. at 145.

Downey further testified that a few days after the search, Tinoco posted on Facebook the following message directed at the magistrate judge who had authorized the warrant: "I can tell you right now you . . . are a superstar. I can see the cameras everywhere. . . . Smile honey, . . . you're going to be famous. . . . Extra, extra, read all about it. 32 holes in your brand new outfit." *Id*. at 166. In at least one of his posts on Facebook, Tinoco stated "[y]ou may quote me. I mean every fucking word." *Id*. at 170.

Tinoco continued to post messages on Facebook directed to the magistrate judge: "I shall [figuratively speaking] cut your fucking head off with this shit . . . this is my machete . . . for your ignorance does not constitute authority." Aplee. Supp. Excerpts of Record at 12. He also posted that "when all is [said] and done, someones mothafucking fingers are being cut off [speaking figuratively]. Are they mine or yours?" *Id*. at 14.

Tinoco didn't challenge the fact that he made and/or posted the statements, but argued the statements were hyperbole and intended to call attention to his grievances—not true threats.

On the last day of trial, two jurors told the court clerk they were concerned because Tinoco was "staring at the jurors." The jurors reported that they were uncomfortable and felt "unsafe to go out to dinner." R., Vol. III at 219. The district court asked the parties for suggestions as to how to address the jurors' concerns. Tinoco suggested the court should examine the two jurors individually and replace them if necessary. The government maintained that a juror contact instruction was adequate. The court adopted the government's suggestion:

> I've considered alternatives. I've considered the remedial steps that I intend to take, *including the juror contact order, which I will present to the jury*; the fact that we will collect the voir dire data and have it held by the attorneys; the fact that we have never addressed any of the members of the panel or jury by name; the assurance this will provide. . . . I'm employing reasonable means to provide assurance.

*Id*. at 227 (emphasis added).

The district court then asked the parties if there was anything else before the jury returned to the courtroom. Tinoco's counsel replied: "Nothing, Your Honor. Thank you." *Id*. at 228.

Following the jury's guilty verdict, the probation department prepared a presentence report that contained a guidelines sentencing range and standard terms of supervised release. Tinoco objected to any terms of supervised release that imposed drug testing and monitoring. The district court overruled his objections and

5

sentenced Tinoco to 63 months' imprisonment, followed by three years of supervised release that included standard terms of drug monitoring and testing.

## DISCUSSION

**Sufficiency of the Evidence**

Tinoco can be constitutionally convicted only if he made a "true threat." "[T]rue threats [are] statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual." *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (internal quotation marks omitted). "In distinguishing between true threats and protected speech, this court asks whether those who hear or read the threat reasonably consider that an actual threat has been made." *Id.* (internal quotation marks omitted).

"[W]hether a defendant's statement is a true threat or [protected] speech is a question for the jury." *Id.* at 742 (internal quotation marks omitted).[1] We review "claims of evidentiary sufficiency under a deferential standard, viewing all the evidence, . . . with all reasonable inferences . . . , in the light most favorable to the prosecution[,] . . . [and ask] whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 741-42 (brackets and internal quotation marks omitted).

---

[1] "[I]f there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law." *Wheeler*, 776 F.3d at 742 (internal quotation marks omitted).

Tinoco maintains that no rational trier of fact could have found his statements were "true threats" because (1) he didn't intend to place the victims in fear; (2) his Facebook posts didn't reach the victims; and (3) he frequently peppered his statements with the phrase "figuratively speaking." We disagree. Ample evidence existed from which a rational trier of fact could have found the statements to be "true threats," including (1) R.F.'s testimony that he took the threats seriously; (2) Tinoco's admission to Downey that people who received his threats would feel threatened, and (3) Tinoco statements: "I mean every word" and "You can quote me."

**Prosecutorial Misconduct**

Tinoco argues for the first time on appeal that the prosecutor's repeated description of the "statements as 'threats' improperly influenced and forged the mental acceptance of jurors to ultimately regard statements as 'threats' from the outset." Aplt. Opening Br. at 21.

We generally won't consider arguments not raised in the district court. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("[I]f the theory . . . wasn't raised before the district court, we usually hold if forfeited."). When a party forfeits an argument by failing to raise it in the district court, we may nevertheless review the issue for plain error. *See id.* ("[W]e will entertain forfeited theories on appeal, but we will reverse . . . on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result."). But Tinoco hasn't argued for plain-error review, and his failure to do so "marks the end of the road for an argument for reversal not first presented to the district court." *Id*. at 1131.

7

**Failure to Excuse Jurors**

Near the end of the trial, two jurors advised the court clerk that Tinoco was staring at the jurors and that it bothered them. As we detailed above, the district court ultimately rejected Tinoco's suggestion to interview the jurors, and determined that the juror contact instruction was sufficient. Notably, Tinoco's counsel didn't object.

Tinoco argues for the first time on appeal that the district court erred. He further suggests that the two "complaining" jurors should have been excused *outright*. Because Tinoco didn't object below, we review this issue for plain error. *See Richison*, 634 F.3d at 1128. But Tinoco fails to argue for plain-error review; thus, he has waived the issue. *See id*. at 1131.

**Cumulative Error**

According to Tinoco, the prosecutor's repeated use of the term "threats," coupled with the district court's failure to replace the two jurors who reported that he was staring at the jury, "robbed him of his right to a fair trial, his due process of law, and ultimately his justice." Aplt. Opening Br. at 23.

"A cumulative error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Barrett*, 496 F.3d 1079, 1121 (10th Cir. 2007) (internal quotation marks omitted). "Only actual errors are considered in determining whether the defendant's right to a fair trial was violated." *Id*. (internal quotation marks omitted). We have addressed

8

Tinoco's arguments and found neither harmless error nor any non-reversible plain error. Thus, we reject his cumulative error argument.

**Failure to Continue the Trial**

Next, Tinoco argues that the district court's decision to conduct the trial in October, instead of a later date, deprived him of the opportunity to learn the rules of evidence and other aspects of the law, which in turn resulted in his unpreparedness for trial. Further, Tinoco maintains that the district court's refusal to give him more time to prepare necessitated his reliance on stand-by counsel to defend him at trial.

Our examination of the record reveals that Tinoco never requested a continuance. The parties met for a status conference in June 2016 at which time the district court set the October trial date. Because Tinoco planned to represent himself, he asked for more time to study the law, including the rules of evidence: "[I]n order to be properly prepared, I would prefer that our trial date be a little bit further away from October." Supp. R., Vol. II at 97. The court responded: "[W]e can talk about that [at the] August . . . [pretrial conference], but I'm going to advise you that it's in your best interest to have this case tried more quickly while recollections are fresh." *Id*. at 98. But when the parties met in August, Tinoco didn't question the trial date, nor did he seek a continuance at the final pretrial conference in September. And he didn't ask for a continuance on the day of trial.

Tinoco's failure to raise this issue in the district court means that we review the issue for plain error. But again, Tinoco's failure to argue for plain-error review "marks the end of the road." *Richison*, 634 F.3d at 1131.

9

**Terms of Supervised Release**

Finally, in his written response to the presentence report and at his sentencing hearing, Tinoco objected to the terms of supervised probation. Specifically, Tinoco argued that his religious beliefs provided a legitimate basis for him to ingest marijuana, and that the standard terms of release that subjected him to drug monitoring and testing imposed a unconstitutional burden on these religious beliefs, citing the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("Government shall not substantially burden a person's exercise of religion . . . [unless] it demonstrates that . . . the burden . . . is in furtherance of a compelling governmental interest[] and [] is the least restrictive means of furthering that compelling governmental interest.").

Assuming *arguendo* that Tinoco established a sincerely held religious belief, the government established a compelling interest to justify the terms of supervised release, including the fact that the conditions are the least restrictive means available to protect its compelling interest.

Relevant here, "Congress has required courts to include two prohibitions as 'explicit condition[s] of supervised release' for *all* defendants: 'that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance.'" *United States v. Lafley*, 656 F.3d 936, 940 (9th Cir. 2011), (quoting 18 U.S.C. § 3583(d)). The condition regarding controlled substances "is consistent with the congressional finding in the Controlled Substances Act that the illegal importation, manufacture,

distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." *Id*. (brackets and internal quotation marks omitted). The mandatory requirement "also represents Congress' judgment about the importance of preventing drug abuse among those who have been convicted of crimes and sentenced to a term that includes a supervised release component." *Id*. Thus, it is beyond dispute that the government has a compelling interest in prohibiting Tinoco from using marijuana.

Further, the conditions of supervised release governing the use of marijuana and testing are no broader than the compelling government interest at stake. The conditions simply state that Tinoco "must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.,) that impair [his] physical or mental functioning, whether or not intended for human consumption," R., Vol. I at 99, and he "must submit to substance abuse testing" to determine whether he has used a prohibited substance. *id*. at 100. Tinoco has failed to articulate how less restrictive conditions could feasibly and adequately prevent him from using marijuana, which is prohibited by Congress for *all* defendants on supervised release. *See* 18 U.S.C. § 3583(d).

The judgment of the district court is affirmed.

Entered for the Court<br>
Per Curiam

11