25CA0890 Peo v Hernandez 03-12-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0890
El Paso County District Court No. 23CR4830
Honorable Dinsmore Tuttle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellant,

v.

Ashley Hernandez,

Defendant-Appellee.

---

ORDER AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 12, 2026

---

Michael J. Allen, District Attorney, Doyle Baker, Senior Deputy District Attorney, Amanda Velazquez, Deputy District Attorney, Colorado Springs, Colorado, for Plaintiff-Appellant

Christopher Gehring, Alternative Defense Counsel, Yona Porat, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellee

¶ 1 The People appeal the district court's order dismissing criminal charges against defendant, Ashley Hernandez. We affirm.

## I. Factual Background

¶ 2 On August 2, 2023, Judge Diana May presided over a preliminary hearing for a case involving Hernandez's boyfriend, Derrick Bernard. Judge May found probable cause at the hearing but recused herself ten days later after learning that Bernard had made certain comments about her. Specifically, Judge May had received information that, during a series of inmate calls Bernard had made to Hernandez on August 3, he discussed the case's victim and detectives working on the case. He also said the following:

> It's unrelated but I didn't know ol' dirty Dianna [sic] May was a part of the compromised judge list but after yesterday's fiasco I'm sure she's on the recovered codex registry. That'll be taken care of too soon though. I'm just the messenger shorty, I'm not the ringleader, not by a long shot.

Hernandez was supposed to record and transcribe the conversations, which she would later distribute to multiple people involved in Bernard's case. After learning about these conversations, Judge May recused herself because she felt that "she could not be unbiased due to being threatened by Bernard."

1

¶ 3     Two months later, Bernard had another hearing.  Courtroom security video recorded a woman, later identified as Hernandez, walking from the third-floor courtroom, where Bernard's hearing was held, to an elevator bay.  While Hernandez waited for an elevator, Judge May approached the elevator bay.  Both entered the same elevator; they were the only occupants.  Judge May didn't know who Hernandez was.  Hernandez confronted Judge May about her involvement with and recusal from Bernard's case.

¶ 4     Once the elevator reached the first floor, both women got out — Hernandez left the courthouse, and Judge May immediately went to security to report the encounter, relaying the following information:

- An unknown woman confronted Judge May, telling her that she was unethical and should have recused herself from Bernard's case.

- The woman's demeanor was aggressive; her shoulders were stiff; she was "hyper focused"; and her voice was "deliberate, firm[,] and commanding."

- Judge May told the woman that she was not allowed to comment on the case and moved toward a side wall of the elevator to put distance between her and the woman.

- Despite telling the woman that she couldn't comment on the case, the woman continued to confront Judge May, telling her what happened in Bernard's case was illegal and that he was in custody because of Judge May.

- Judge May asked for the woman's name, which the woman didn't provide.

- After Judge May told the woman to stop, the woman moved closer and said, "I know your husband is a cop," which led the judge to believe the woman had researched her family and made Judge May fearful.

Judge May later told the detectives that she approached security because she felt threatened and was worried that the unknown woman could be waiting for her outside.

¶ 5    At some point, Judge May obtained a printed version of a link chart connecting people and institutions to Bernard's case, which she had with her during her interview with Detective Anthony Nevarez, who was investigating the case.  The chart was

presumably created by Bernard and alleged that the Colorado Springs Police Department and some judges were corrupt. A photograph of Judge May appeared in the chart with the words "biased and prejudiced" above her photograph. Judge May also had a photograph of Hernandez, which was given to her by security for her safety following Bernard's threats. Judge May told detectives that she believed Hernandez was the unknown woman that she had encountered in the elevator.

¶ 6    The same day as the elevator encounter, Bernard and Hernandez had another inmate call. Hernandez told Bernard that she was present for his hearing and that, after she left the courtroom and waited for an elevator, she saw Judge May heading towards the elevator. Hernandez recounted the conversation she had with Judge May as follows:[1]

---

[1] Although the audio recording from the elevator encounter was included as a trial exhibit, the sound quality was poor and made the conversation difficult to understand. The conversation was transcribed based on the jail call recording, with Hernandez speaking for herself and Judge May as she described the conversation to Bernard. Detective Nevarez testified that, while not "word for word," Judge May's recollection of the conversation and the statements made in the jail call were, "for the most part, fairly similar." The district court relied on the transcription, and we do too.

Hernandez: Judge Diana May?

Judge May: Oh yes.

Hernandez: Can you comment why you were biased on the Bernard case?

Judge May: I can't comment on that. Commenting on that would be unethical.

Hernandez: No, what was unethical was you taking that case knowing you were biased and going through a whole preliminary hearing and disturbing someone's due process rights. That's what was unethical. You knew you were unethical when you took that case. Right? Correct?

Judge May: I'm not answering.

Hernandez: You knew you been married to a law enforcement officer for over two decades, correct?

Judge May: I'm not answering these questions. I am not answering that question, and this is getting inappropriate.

Hernandez: No, what's inappropriate is you waking up next to a cop [every day] and going in there and deciding not to recuse yourself until [eleven] days after his court date. That's what's inappropriate.

¶ 7    Hernandez told Bernard that the elevator ride must have been the "longest elevator ride of th[at] bitch's life" and that Judge May "darted" as soon as the elevator doors opened. After recounting the

story, Hernandez told Bernard that she was not going to "let that bitch" walk past her without saying anything.

## II.    Procedural History

¶ 8    Hernandez was charged with retaliation against a judge as an act of harassment under section 18-8-615(1), C.R.S. 2025. Hernandez filed a motion asking the court to dismiss the charge against her because (1) the People didn't specify which subsection of the harassment statute she had violated; and (2) her statements were protected speech under the First Amendment, and, thus, she was immune from prosecution. The People then filed a motion to amend the complaint, which the court granted. Hernandez's previous charge — retaliation against a judge "commits an act of harassment" — was changed to retaliation against a judge "makes a credible threat."

¶ 9    The court held a hearing, in part, to resolve Hernandez's argument that, as applied, section 18-8-615(1)(a) violated her First Amendment rights. Hernandez's counsel argued that her statements were not true threats and were protected speech, while the People countered that, based on the totality of the circumstances, her statements were threats.

6

¶ 10 The district court noted that if it "were assessing the sufficiency of the complaint without applying a First Amendment analysis, the charge appear[ed] to be facially sufficient to support th[e] prosecution," but because the court was required to determine whether Hernandez's alleged "credible threat" was a "true threat of violence" outside the bounds of First Amendment protection and punishable as a crime, it had to consider the statements in light of *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). Under *Counterman*, the court had to consider Hernandez's subjective understanding of the threatening nature of her statements and whether she acted recklessly by making them.

¶ 11 The court concluded that the People did "not have sufficient evidence to support a finding that [Hernandez] made threats toward Judge May that constituted true threats, nor that [Hernandez] understood and recklessly disregarded the threatening nature of those communications." The court dismissed the charge against Hernandez on the grounds that the statements were protected speech under the First Amendment of the United States Constitution and article II, section 10, of the Colorado Constitution. The People appeal.

7

The People contend that the district court erred by dismissing the charge against Hernandez because (1) she had a subjective understanding of the threatening nature of her statements; (2) a jury should have decided whether the statements were true threats; and (3) a reasonable person in Judge May's position, when viewed objectively, would have perceived Hernandez's statements as true threats.

## A.    True Threats

The People first contend that Hernandez had a subjective understanding of the threatening nature of her statements based on their content, her tone and demeanor, her refusal to end the conversation, the location, her refusal to identify herself, and her conversations with Bernard.  We disagree.

### 1.    Standard of Review and Applicable Law

We review de novo a court's grant of a motion to dismiss criminal charges, *People v. Gregory*, 2020 COA 162, ¶ 15, and the constitutionality of a statute as applied, *People v. Chase*, 2013 COA 27, ¶ 65.  To prevail on an as-applied constitutional challenge, the challenging party must show that the statute is unconstitutional

under the circumstances in which she has acted. *People v. Maxwell*, 2017 CO 46, ¶ 7. We also review de novo free speech issues under the First Amendment. *People v. Casper*, 2025 COA 69, ¶ 15.

¶ 15 The free speech protections of the First Amendment are not absolute. *Chase*, ¶ 68. A true threat is a statement by which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *People v. Brown*, 2022 COA 19, ¶ 26 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). True threats fall outside the protections of the First Amendment because "they serve none of the purposes of the First Amendment: they do not express ideas or opinions, and are not part of the marketplace of ideas in which there is dialogue." *People v. Stanley*, 170 P.3d 782, 788 (Colo. App. 2007). A statute that criminalizes a threat must "be applied and interpreted consistently with the First Amendment." *Id.* at 786.

¶ 16 "When the sufficiency of the evidence is challenged on appeal, the reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light

9

most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt." *Id.* at 790 (quoting *People v. McIntier*, 134 P.3d 467, 471 (Colo. App. 2005)); *see also People in Interest of R.D.*, 2020 CO 44, ¶ 65 ("Because we have clarified the test to be used when evaluating whether a statement constitutes a true threat, the trial court is in the best position to review the record, to take further evidence in its discretion, and to reach a conclusion on the matter."), *abrogated in part by, Counterman*, 600 U.S. at 78. While the question of whether a statement is a "true threat" — instead of protected speech — is, in the first instance, one of fact to be determined by a fact finder, when First Amendment concerns are implicated, the court has an obligation to make an independent review of the record as a whole to ensure the judgment doesn't impermissibly intrude on free expression. *Stanley*, 170 P.3d at 790.

¶ 17    In determining whether a statement amounts to a true threat, courts may consider a nonexhaustive list of factors including (1) the statement's role in a broader exchange; (2) the medium through which the statement was communicated; (3) the manner in which the statement was conveyed; (4) the relationship between the

speaker and the recipient; and (5) the subjective reaction of the intended recipient. *R.D.*, ¶ 4. In *Counterman*, the United States Supreme Court held that, in true threat cases, the First Amendment also requires the People to demonstrate that the defendant has some subjective understanding of the statement's threatening nature and at least a reckless mens rea. 600 U.S. at 73. A person acts recklessly in the context of true threats when the individual "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct" will be regarded as threatening violence but delivers the statements anyway. *Id.* at 79 (quoting *Voisine v. United States*, 579 U.S. 686, 691 (2016)).

¶ 18　　Retaliation against a judge under section 18-8-615(1)(a) occurs when an individual makes a credible threat against a judge, commits an act of harassment, or commits an act of harm or injury upon person or property as retaliation or retribution against a judge.

## 2. Analysis

¶ 19　　The People contend that, when considered in context, Hernandez's statements presented a true threat because a reasonable juror could have determined that Hernandez

11

subjectively understood that her statements to Judge May were threatening and that her actions after the encounter demonstrated "not just reckless conduct, but purposeful conduct intended to threaten the judge." In support, they point to the conversations between Bernard and Hernandez before and after the elevator encounter, Hernandez's tone and demeanor toward Judge May, the location of the conversation, and Hernandez's refusal to end the conversation or identify herself.

¶ 20    To that end, the People rely on cases in which courts have concluded that, based on the context and totality of the circumstances, the speaker's statements could have been perceived as "a serious expression of an intent to commit an act of unlawful violence." *R.D.*, ¶ 51; *see, e.g., Brown*, ¶¶ 40-42 (concluding that the content of the defendant's statements, coupled with his physical behavior reflecting his anger, supported a conclusion that his statements constituted true threats to the judge presiding over defendant's case); *Brewington v. State*, 7 N.E.3d 946, 965 (Ind. 2014) (The defendant's publication of a judge's home address "strongly suggest[ed] that [the] [d]efendant could have only intended the address as a hint to the [j]udge that [the] [d]efendant's

campaign would not stop with mere criticism, but would instead jeopardize his family's safety in their own home."); *Pollen v. State*, 834 So. 2d 380, 382-84 (Fla. Dist. Ct. App. 2003) (holding that shoplifter's statement to security associate, "I am going to come back and see you," when he had no reason to do so, viewed in context, could reasonably be interpreted as a threat for purposes of witness tampering).

¶ 21 The cases the People cite, however, are distinguishable from the present case. In *Brown,* the defendant exhibited physical anger throughout a dependency and neglect proceeding in which he was a respondent parent (clenching his fists and jaw, using profanity, and shouting at the judge). *Brown,* ¶ 41. He also made the following statements to the judge after she ordered him to undergo a domestic violence evaluation: "Let me kidnap your daughter and see if you don't get angry. As a matter of fact, where do you live, Your Honor? Let me see if we can get this all resolved. See if you would be angry." *Id.* at ¶ 9. After weighing the *R.D.* factors, the court determined that these statements, which presented a concrete and active proposal to take a person against their will, "could reasonably have been perceived as a serious expression of intent to commit an

act of unlawful violence, and, therefore, constituted a true threat." *Id.* at ¶ 52.

¶ 22    In *Brewington,* the defendant didn't overtly threaten the judge presiding over his divorce proceedings, but the Indiana Supreme Court concluded that, based on his actions and statements to others, Brewington's threatening intent constituted true threats. 7 N.E.3d at 955, 964. Brewington published the judge's home address online; he knew that the judge considered him "dangerous" based on his behavior in the courtroom, which necessitated the presence of a sheriff's deputy during a hearing; and Brewington wrote his child's therapist a letter stating, "I have always said that I would hold everyone accountable for any unethical and/or illegal conduct in matters dealing with my children. *Some would argue that this appears threatening. I would argue that it is a promise.*" *Id.* at 967.

¶ 23    In contrast to the cases the People cite, when considered in the broad context of the elevator encounter and the phone calls between Hernandez and Bernard, Hernandez's statements were not true threats. First, unlike the defendants in *Brown* and *Brewington,* Hernandez didn't target Judge May. The encounter

14

was coincidental — Hernandez was waiting for an elevator, and Judge May approached and entered the same elevator. Though Hernandez's statements were disrespectful and inappropriate, they weren't true threats because no reasonable juror could find that the statements conveyed Hernandez's intent to commit an act of violence against Judge May or her husband.

¶ 24    Rather, Hernandez's statements criticized Judge May's ethics and expressed Hernandez's opinion that Judge May was biased. A criticism of a judge's actions is not intrinsically a threat and is protected by the First Amendment. *See Stanley*, 170 P.3d at 791 ("A statement of critical opinion about a judge is protected . . . because it serves the principal purpose of the First Amendment — to safeguard public discussion of governmental affairs."); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) ("[T]he [Supreme Court of the United States] has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." (citations omitted)).

¶ 25    And although Hernandez's statement, "You knew you been married to a law enforcement officer for two decades," may have

15

been unsettling, the context of this statement clarified that Hernandez was not threatening to harm Judge May or her husband but was instead criticizing Judge May based on her perception that Judge May was biased in favor of law enforcement officers. Specifically, she told Judge May that (1) it was unethical to preside over the case "knowing you were biased and going through a whole preliminary hearing and disturbing someone's due process rights," and (2) it was "inappropriate" for Judge May to be "waking up next to a cop [every day] and going in there and deciding not to recuse [herself] until" after the preliminary hearing.

¶ 26 True, Judge May described Hernandez's posture and demeanor as "aggressive" and "stiff" and her voice as "deliberate, firm[,] and commanding." But, again, considered in context, Hernandez's demeanor and tone reflected her frustration; that conduct doesn't elevate her statements to a true threat. *See Brown*, ¶ 24 ("[C]ourts must be cautious in distinguishing between an emotional courtroom outburst of a frustrated litigant and a credible threat directed to a judicial officer."). Moreover, Detective Nevarez testified that Hernandez didn't touch or threaten to physically harm Judge May, and law enforcement was already aware that Hernandez

16

was "very outspoken about . . . Bernard's current legal situation through social media and various other outlets." Hernandez's anger, however, doesn't show that she subjectively understood her statements criticizing Judge May to be threatening or that she recklessly disregarded their threatening nature and made them anyway.

¶ 27    Finally, the People also contend that, before the elevator encounter, Bernard and Hernandez were "plotting . . . to target the judge on a 'compromised judge list.'" While we disagree with the district court's finding that Bernard's statements were irrelevant, the statements are not enough to show that Hernandez intended to threaten Judge May. First, the People didn't present evidence that Hernandez made any threatening statements about Judge May during her conversation with Bernard; they asserted that Bernard made threatening statements. Second, Bernard's statements following his preliminary hearing were made two months *before* the elevator encounter. Although Bernard's statements concerning Judge May may have explained, in part, why Judge May was fearful and perceived Hernandez's statements as threatening, they don't

17

show that Hernandez had a subjective understanding that her statements were threatening.

¶ 28    Similarly, while Hernandez's statements to Bernard discussing the elevator encounter may have demonstrated that Hernandez realized (or even relished) that she made Judge May uncomfortable, causing discomfort isn't equivalent to making a threat, nor is it a crime. Also, her conversation with Bernard occurred after the fact, and those statements were made to him — not to Judge May.

¶ 29    Under the applicable law, we agree with the district court that no reasonable juror could have found Hernandez's comments were true threats. We therefore discern no error.

## B.    Submission to the Jury

¶ 30    The People contend that the jury should have determined whether Hernandez's statements were true threats. Under the circumstances presented here, we disagree.

¶ 31    Case law from both Colorado courts and the Tenth Circuit Court of Appeals suggests that, in most cases, "whether a statement is a true threat is a question of fact to be determined by the fact finder." *Chase*, ¶ 70; *see United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015); *United States v. Viefhaus*, 168 F.3d 392, 397 (10th

Cir. 1999). But "if there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law." *Viefhaus*, 168 F.3d at 397. And as detailed above, such a dismissal is warranted here. *Cf. Chase*, ¶ 70 (noting that, even if the fact finder concludes that a statement is a true threat, "the court has an obligation to make an independent review of the record to assure that the judgment does not impermissibly intrude on the field of free expression"); *Wheeler*, 776 F.3d at 742 (Appellate courts reviewing true threats must "determine for themselves whether the fact-finder appropriately applied First Amendment law to the facts."); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995) ("[W]e must . . . decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection.").

¶ 32 We are unpersuaded by the People's reliance on *United States v. White*, 610 F.3d 956, 962 (7th Cir. 2010), for the proposition that any "dispute over the meaning and inferences that can be drawn from the facts" is an issue for the jury to decide. In *White*, the defendant created and maintained a website advocating violence

against enemies of white supremacy. *See id.* at 957. Following the conviction of a prominent white supremacist, the defendant posted on his website a picture, the name, address, and telephone number of the jury's foreperson and called him a "[g]ay anti-racist . . . juror . . . [who lived with his] gay [B]lack lover." *Id.* at 957-58. The defendant was charged with solicitation of a crime of violence, which the district court dismissed after concluding that the posting was protected by the First Amendment. *Id.* at 958.

¶ 33    On appeal, the Seventh Circuit Court of Appeals reversed because the government explained that it had "further evidence of the website's readership, audience, and the relationship between [the defendant] and his followers" that was not presented in the indictment. *Id.* at 962. The government argued that such evidence would show that the posting was a specific request to the defendant's followers, who would understand the nature of the request and were willing to act upon it. *Id.* In other words, the court didn't know all the facts and circumstances surrounding the statements, so dismissal was premature. *Id.*

¶ 34    Here, in contrast, the parties appeared to agree about the facts and circumstances surrounding the encounter. Both parties agreed

that Hernandez wasn't waiting for Judge May by the elevators and that the encounter was coincidental; Hernandez made the statements to Judge May; Hernandez was confrontational during the encounter; Bernard made phone calls to Hernandez about Judge May before the encounter; a chart was created that included Judge May's photograph; and Hernandez and Bernard discussed the elevator encounter after it occurred. Further, the prosecution didn't indicate that it had any other evidence about the circumstances surrounding the statement that it didn't present at the hearing. Thus, the only issue for the court to resolve was whether section 18-8-615(1)(a) was constitutional as applied to Hernandez, which it could determine as a question of law. *Hurley*, 515 U.S. at 567.

¶ 35 The district court, therefore, did not err by concluding that the statute couldn't be constitutionally applied to Hernandez.

### C. Whether, When Viewed Objectively, Hernandez's Statements Were True Threats

¶ 36 The People contend that, viewed objectively, Hernandez's statements constitute true threats. Having concluded, however,

21

that no material factual dispute existed, we need not address this argument.

## IV.   Disposition

¶ 37    The order is affirmed.

JUDGE J. JONES and JUDGE LUM concur.